# CASES

## ARGUED AND DETERMINED

IN

# THE SUPREME COURT

OF

## THE STATE OF MISSOURI,

OCTOBER TERM, 1865, AT ST. LOUIS.

———◦●●◦———

THE STATE OF MISSOURI, Respondent, *v.* J. A. CUMMINGS,
Appellant.

1. *Constitution—State—Church.*—The State has the power to regulate, control
   or prohibit any trade, business, or profession, within the limits of its juris-
   diction. The provisions of the new Constitution, Art. II., §§ 6, 9, 14 & 3,
   do not conflict with the provisions of the Constitution of the United States.
   Such provisions are not in the nature of an *ex post facto* law, nor of a bill of
   attainder. A bill of pains and penalties is a law in the nature of a judicial
   act declaring a person's estate confiscated, or forfeiting some right, without
   giving him the right to be heard before a judicial tribunal, and by its own
   force inflicts the penalty. The provisions of Art. II. merely prescribe cer-
   tain prerequisites for the doing of certain acts, and inflicts a penalty only
   for failing to comply with the conditions prescribed.
2. *Constitution—Ex post facto Law.*—The provisions of Art. II., §§ 6, 9, 14 &
   3, are not in the nature of an *ex post facto* law, for they do not impose any
   penalty for any act previously done; but punish the doing of some future
   act unless certain terms are complied with, which is violating an existing
   law.
3. *Constitution—Declaration of Rights.*—The provisions of Art. II., §§ 3, 6, 9
   & 14, of the new Constitution do not conflict with the provisions of Art. I.

*Appeal from Pike Circuit Court.*

*Whittelsey* with *R. A. Campbell,* for appellant.

I. Requiring this oath of a clergyman before he can be al-
lowed to preach, is inconsistent with the principles of gov-

ernment as declared by the Declaration of Rights in the first article of the Constitution. The provisions of the second article conflict with those of the first, and especially with sections 1, 2, 3, 9, 18, and 27.

What is the Declaration of Rights? It is a declaration of the principles upon which the government is founded, the objects it is intended to secure, and of those fundamental rights which belong to the citizen as a man, and not as a member of a political society. It is a limitation upon the powers granted by the Constitution.

It is, therefore, by the principles contained in the Declaration of Rights that the Constitution and all statutes enacted by its authority are to be construed. The Declaration of Rights is the superior law of the Constitution. It is so stated in the preamble to the Declaration of this New Constitution: "That the general, great and essential principles of liberty and free government may be recognized and established," "we do declare," &c.

1. "That we hold it to be self-evident, that all men are endowed by their Creator with certain inalienable rights, among which are life, liberty, the enjoyment of the fruits of their own labor, and the pursuit of happiness." What is meant by inalienable rights, if it be not that these rights belong to the citizen as a man because he is a man, and not as a member of civil society, a component portion of the State.

2. The provisions of Art. II. (so far as it affects the defendant) conflict with the 3d sec. of Art. I., as it makes him liable to a punishment to which others who have done the same acts are not exposed.

3. These provisions of Art. II. destroy the freedom of worship, and attack the freedom of conscience.

In the 9th section of the Declaration, it is announced as one of the great and essential principles of liberty, "that all men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences;" " that no human authority can control or interfere with the rights of conscience."

Freedom of worship implies more than the simple act of private prayer to God, or even of public prayer in the congregation. That there be freedom of worship, it is requisite, not only that the congregation have the liberty of assembling in their churches, but that they also have the right of receiving instruction in their duties to God by the preaching of the minister set over them by their church. If they may only listen to the preaching of him who has a license from the State, they are not free to worship according to the dictates of their OWN consciences, but they are directed by the con sciences of those who happened to have the majority of votes, and who therefore controlled the administration by adopting the Constitution.

4. Preference is given by law to one church over another, contrary to section 9, Art. I.—to the loyal over the disloyal church, so called. The church may not have a preacher of their own selection, unless it be one who can take the "oath of loyalty," so called; and thus the law gives a preference to the loyal church, so called.

5. The preacher accused is compelled to give evidence against himself, and is deprived of his liberty of preaching without trial. In form, he is at liberty to prove his innocence by taking the oath. If he take the oath falsely, he is punished for perjury; if he do not take the oath, he is punished by deprivation of his right to preach, of his office in the church as a preacher.

6. The provisions of Art. II. destroy the freedom of speech. If the preacher has ever, by words uttered, manifested his ad_ herence to the enemies of the United States, or his sympathy with those engaged in the rebellion, then he cannot take the oath, and without taking it he is forbidden to preach; and thus he is punished for his words spoken. What freedom of speech is there when a man can be deprived of his rights for words spoken—words not spoken falsely of his neighbor, but expressive merely of his opinions upon the questions of the day or the hour?

II. Article II., by its provisions, (so far as it applies to the

defendant) is in violation of the Constitution of the United States, it being an *ex post facto* law, punishing an offence previously committed by a penalty not prescribed at the time of the commision of the act, by increasing the penalty for the offence, and by making an act criminal which was innocent when it was done. (Calder v. Bull, 3 Dall. 186; Fletcher v. Peck, 6 Cranch, 87.) "An *ex post facto* law is one which renders an act punishable in a manner in which it was not punishable when committed."

The provisions of the second article, sections 2, 6, 9 and 14, of the New Constitution, so far as they apply to preachers, priests, bishops, elders, and other religious teachers living in this State at the time of the adoption of this Constitution, come within the intent of this prohibition.

What is a penalty or punishment? It is the depriving a man of a right enjoyed, or the inflicting upon him a pain, by authority of law, in consequence of some act done by him. 1 Black. Com. 7, defines punishment " as the evils or inconveniences consequent upon crimes and misdemeanors; being devised, denounced and inflicted by human laws in consequence of misbehavior in those, to regulate whose conduct such laws were respectively made."

Let us examine the provisions of Art. II., secs. 2, 6, 9 & 14, and see what they are. By sec. 6, no person may act as bishop, priest, deacon, &c., or teach or preach, unless he take the oath that he has not done any of the acts specified in sec. 2d of said article. What are the acts specified? We may classify them as follows: 1. That he has not committed treason against the United States—a crime punishable by the Constitution and laws of the United States. 2. That he has not committed treason against the State of Missouri—a crime punishable by the laws of this State prior to the adoption of the New Constitution. 2. That he has not, by word, manifested his desire for the triumph of the enemies of the United States or of this State, or his sympathy with those engaged in the rebellion —words, the utterance of which was not criminal either by the laws of the United States or of this State. 4. That he

has not gone from one State to another to avoid the draft into the military service of the United States—an act which Congress might have declared criminal, but did not. 5. That he has not caused himself to be enrolled as a Southern sympathiser, or in sympathy with those engaged in the rebellion, to avoid enrolment or service in the militia of this State. 6. That he has not claimed his privilege as an alien, to secure exemption from service in the army of the United States, or in the militia of this State, after having voted or held office in any State or Territory—acts which were not criminal by any law whatever; for, by the laws of some of the States and Territories, any white male of lawful age can vote after six months' residence.

Now, if the preacher has done any of these acts, he is deprived of the right previously his, and this right is taken away from him as a consequence of his having done the acts; that is, to the penalties previously denounced by law against such acts is added the additional punishment of being debarred from pursuing his calling as a preacher.

This act, then, is punished in a manner in which it was not punishable when committed. Some acts are treated as criminal, and the preacher is to be punished for them, when the acts were not declared criminal by any law in existence at the time the act was done. He is punished, without fair trial by a jury of his peers, without accusation and opportunity for defence given by being confronted with the witnesses.

Sec. 2, Art. II., adds to the penalty of treason as prescribed by the U. S. Constitution, the additional penalty of the right to practise law, the right to teach even in private, and the right to preach as an officer of any church organization. It takes the form only of requiring a license, but under this form is the penalty of crime. (Dorsey's Case, 7 Port. Ala. 295; Opinion of Trigg, U. S. Dist. Ct. Tenn., Newspaper report.)

2. The provisions of Art. II. have the effect of a bill of attainder, which the States are prohibited from enacting by the Constitution of the United States. It is in fact a bill of pains

and penalties, declaring a general forfeiture of the right to preach and teach as bishop, priest or deacon, &c.

By using the general term "bill of attainder" in the Constitution, it was intended to cover also the cases of bills of pains and penalties. (Sto. Com. Const. § 1344 & 1373. (See opinion of Iredell, Jr., in Calder.v. Bull, 3 Dall. 386.)

In the case at bar, the defendant, if he have done any of the acts specified in sec. 3, Art. II., forfeits the right, previously his, of preaching, and can be restored to that right only by taking an oath of innocence. Every priest or minister is charged with crime, but may take an oath of purgation; if he do not take the oath, forfeiture follows, and that is a punishment—a penalty—a pain. Such was the object of the provision, such is its effect.

III. These provisions of Art. II., §§ 3, 6, 9 & 14, of the New Constitution usurp the powers of the Federal Government by undertaking to punish offences against the United States.

The sovereignties of the United States and of this State are distinct and exclusive. The legislative jurisdiction over offences against the United States is exclusively in Congress. A State cannot assume jurisdiction of offences against the United States; it cannot give such jurisdiction to its courts, nor can Congress give it: that jurisdiction is exclusively in the courts of the United States. (The People v. Lynch, 11 Johns. 549.)

One country will not enforce the penal laws of another country, and so the State courts will not enforce the penalties prescribed by acts of Congress even in favor of individuals. It was so decided in the following cases: Scoville v. Canfield, 14 Johns. R. 339; U. States v. Campbell, 6 Hall's Am. L. J. 113; Commonwealth v. Feely, 1 Va. Cas. 321; Ely v. Peck, 7 Conn. R. 239; Davison v. Champlin, 7 Conn. 244; Heney v. Sharp, 1 Dana, Ky. 442; Mattison v. State, 3 Mo. 421.

In Martin v. Hunter's lessee, 1 Wheat. 304, it was held by the Supreme Court, "that no part of the criminal jurisdic-

tion of the United States could, consistently with the Constitution, be delegated to State tribunals." (See also Houston v. Moore, 5 Wheat. 1, and Fox v. State of Ohio, 5 How. 510.)

Congress has declared what is treason—what shall be its penalties; it has also provided for punishing conspiracies, and for suppressing insurrection and rebellion. (Acts July 17, 1862, 12 Stat. L. &. B.'s Ed., p. 589; Acts Aug. 6, 1861, 12 Stat., p. 319; Acts July 13, 1861, 12 Stat., p. 257.)

Now if Congress cannot confer criminal jurisdiction, over offences committed against the United States, upon the courts of the States, *a fortiori*, the States themselves cannot give that jurisdiction; still less can they assume the power of legislating for such offences.

Offences against the laws of the United States the President may pardon; he may remit the penalties prescribed; but here is a penalty he cannot remit, an offence he cannot pardon.

IV. When Congress has legislated upon a subject within its powers, its legislation is exclusive; the States cannot interfere with it, nor legislate upon the same subject matter. (See Sturgess v. Crowninshield, 4 Wheat. 122; Ogden v. Saunders, 12 Wheat. R. 113; United States v. Fisher, 2 Cranch, 358; 1 Kent Com. 409; Slocum v. Mayberry, 2 Wheat. 1; McNutt v. Bland, 2 How. 17; Fox v. State of Ohio, McLean's opinion, 5 How. 510; United States v. Coombs, 12 Pet. 72.)

Congress has legislated upon the subject of treason, and enacted laws to punish conspiracies and rebellion against the United States; the State of Missouri, therefore, cannot legislate upon the same subject matter; it cannot legislate either by Convention or by General Assembly.

*E. P. Johnson*, for respondent.

The law under which the indictment was framed is valid. The Constitution of the State is not in conflict with the Constitution of the United States. The Constitution of the

18—VOL. XXXVI.

United States does not restrain the States from legislating in respect to an establishment of religion, or prohibiting the free exercise thereof.

The first article of the Amendments to the Constitution of the United States, like all other prohibitions contained in that instrument, when not otherwise expressed, is not a limitation of State power, but of the United States only. (Art. 10, Amend. to Const. of U. S.; Barron v. Mayor, &c., of Baltimore; 7 Pet. 243; 3 How. 609.)

The Constitution of the State is not *ex post facto* in its operation. The term *ex post facto* has a technical meaning, and is confined to criminal cases, to legislative enactments; make an act punishable as a crime or offence which was not so when committed, or which enhances the punishment or penalty of an offence after it is committed. (Calder v. Bull, 3 Dal. 386; 3 Pet. 110.)

The Constitution of the State does not provide a punishment for past offences, but for violation of an existing law. The States have power to pass retrospective laws, provided they are not *ex post facto*, and do not impair the obligation of contracts. (Philadelphia & Wil. R.R. Co. v. Maryland, 10 How. 401, and authorities there cited.) There is nothing in the Constitution of the United States to prohibit the States from restricting or prohibiting the exercise of any trade or profession, or from prescribing the qualifications of persons who exercise such trade, and the State may do so if the law-making power should deem it expedient. (Austin v. The State, 10 Mo. 591.)

Freedom of conscience, in its legal acceptation, signifies that no person can be compelled to profess any form of religious belief, or to practise any peculiar mode of worship, in preference to another. It is simply a right to worship the Supreme Being according to the dictates of the heart; to adopt any creed or hold any opinion whatever, or to support any religion, and to do, or forbear to do, any act for conscience' sake, the doing or forbearing of which is not prejudicial to the public weal. (Spect v. Commonwealth, 8

Barr. 322, and cases there cited.)   The Constitution of the State does not violate the above definition in any sense. There is no moral standard by which a court can adjudge a law void.   The law-making power is governed only by the Constitution, and when laws are not in conflict with it, they must be respected.   (1 Kent, 448; 3 Dal. 398; by Iredell, J., 1 Sneed, 637, Tenn.; Bish. Crim. Law, § 428, 3d ed.)

A bill of attainder is an act of the Legislature, by which one or more persons are declared to be attainted and their property confiscated.   (Bouvier's Law Dict., Tit. Bill of Attainder; Sto. on Const., 1344.)   The Constitution of the State has no such operation.

WAGNER, Judge, delivered the opinion of the court.

The appellant stands convicted under sections three, six, nine and fourteen of the second article of the Constitution of this State.   The ninth section, *inter alia*, declares that no person shall " be competent as a bishop, priest, deacon, minister, elder, or other clergyman of any religious persuasion, sect, or denomination, to teach, or preach, or solemnize marriages," unless such person shall have first " taken, subscribed and filed" the oath specified in section six.

It is contended that that part of the Constitution requiring the persons above enumerated to take, subscribe, and file said oath before they are permitted to pursue their avocations or callings, is in contravention of Article I., sec. 10, of the Constitution of the United States, which prohibits the States from passing " any bill of attainder, *ex post facto* law, or laws impairing the obligation of contracts," and is, therefore, inoperative and void.

Bills of attainder are said to be such acts of the Legislature as inflict capital punishment upon persons supposed to be guilty of high crimes and offences, such as treason and felony, without any conviction in the ordinary course of judicial proceedings.   If they inflict a milder punishment than death, they are called bills of pains and penalties.   Bills of attainder may include bills of pains and penalties, and they

may affect the life of an individual, or confiscate his property, or both. (2 Sto. on Const. § 1344.) An *ex post facto* law " is when an action is declared to be a crime, which at the time it was done was innocent, or when it aggravates a crime, and declares it to be greater than it was when committed; or when it increases the punishment, or directs that different or less evidence shall be sufficient to convict the offender." (Raw. on Const., 115; Shepherd v. The People, 25 N. Y. 406.) Bills of attainder are justly considered odious; they are repugnant and abhorrent to all our ideas of justice, and ought never to be tolerated or countenanced. The history of England is full of the most startling examples, where the Parliament has claimed and exercised this transcendent power; and the same power was freely resorted to and exercised by the States at the close of the Revolution, and prior to the adoption of the Federal Constitution. The founders of our government saw the dangers to which the citizen would be exposed in times of high partisan excitement, prejudice and passion, and hence wisely provided for his security against oppression and wrong, by checks and guarantees. The subject was deemed of such great and paramount importance, that not only a direct inhibition was placed on the power of Congress to pass such laws, but it was also extended to the States. Not only justice, but the very genius of our institutions requires, that no man shall be convicted of a criminal offence, or deprived of his property, without the judgment of his peers, or the law of the land. The passing of such laws is not an exercise of legislative function, as they are in the nature of judgments.

When, therefore, it is apparent that laws are clothed with these characteristics, and are in conflict with the supreme law of the land—the Federal Constitution—courts will unhesitatingly declare them invalid and of no effect.

The question, then is : Is the provision in the State Constitution referred to, justly obnoxious to these objections? It does not come within the legal meaning and sense of a bill of attainder; for, as we have seen above, that is an act

inflicting capital punishment. If, then, it is an infraction of the Constitution of the United States in this respect, it must be in the milder form of pains and penalties. To be a bill of pains and penalties, it is necessary that it should judically declare a person's estate confiscated, or create a forfeiture of some right, without giving him the opportunity of being heard in the judicial tribunals of the country. It must be a bill, or law, which by its own force and operation inflicts the wrong complained of.

The clause in the Constitution here in controversy, confiscates no estates, declares no forfeitures, nor does it inflict any pains and penalties. In fact, it passes judicially on nothing. It imposes certain prescribed acts, as prerequisites to doing certain things, and for failure to comply with these acts, or violating the law as it exists, the party is held amenable. It does not, therefore, come within the meaning, scope or reasoning of a bill of attainder, nor of pains and penalties.

But it is said that the law is *ex post facto* in its operations. We will briefly examine and see whether it has any of the attributes properly belonging to laws of this description. The term *ex post facto* has application to civil laws of a criminal nature. (2 Sto. on Const., § 1345; Watson v. Mercer, 8 Pet. 110; Calder v. Bull, 3 Dal. 386; Carpenter v. Commonwealth, 17 How. 456.) It seems clear that the oath prescribed in the Constitution was adopted, not with a view to punishment for any past offence, but for future protection. The preventive provision, embodied in the fourteenth section, is not retroactive, but wholly prospective. It is not easy to perceive how, or in what manner, it attempts to subject to criminal punishment any person guilty of any of the offences mentioned in the third section. It is true certain qualifications are affixed as conditions on which certain designated classes shall engage in some kind of professions and callings. It is declared that no person shall be permitted " to teach, preach," &c., without first having taken an oath; and that any one who shall persist in exercising

such profession or calling after a prescribed time, shall incur the penalties therein expressed.

Clearly, he who refuses to take the oath, and still continues to pursue a calling, where the taking thereof is a prerequisite, or *sine qua non* to render it lawful, violates an existing law. He is not held liable for any acts supposed to have been done or committed antecedently, but for violating an actual subsisting law after its enactment. The distinction between what is legally meant by punishment, and the disability which may incidentally attach, is clear and obvious. It will not be seriously denied, that the State has the right to impose restrictions and conditions on her citizens in the exercise of their callings or professions, as a municipal regulation, provided it is deemed necessary to the public good, and does not deprive them of any natural right; and whether the exigencies of the times demand such enactments, the law-making power is the proper and appropriate judge.

But it is contended that the provisions requiring clergymen to take, subscribe and file an oath, is inconsistent with the fundamental principles of free government, as declared by sections 1, 3, 9, 11, 18, and 27, of the bill of rights. So much of the above sections as apply to the case here, are—

"SECTION 1. That we hold it to be self-evident that all men are endowed by their Creator with certain inalienable rights, among which are life, liberty, the enjoyment of the fruits of their own labor, and the pursuit of happiness.

"SEC. 3. That no person can, on account of color, &c., * * * be restricted in the exercise of religious worship, or be hindered in acquiring education; or be subjected in law to any other restraints or disqualifications in regard to any personal rights, than such as are laid upon others under like circumstances.

"SEC. 9. That all men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience. That no person can, on account of his religious opinions, be rendered ineligible to any office of

trust or profit under this State, nor be disqualified from testifying, or from serving as a juror; that no human authority can control or interfere with the rights of conscience, and that no person ought by any law to be molested in his person or estate on account of his religious persuasion or profession; but the liberty of conscience hereby secured shall not be construed as to excuse acts of licentiousness, nor to justify acts inconsistent with the good order, peace, or safety of the State, or with the rights of others.

" SEC. 11. That in all criminal prosecutions, the accused has the right to be heard by himself and his counsel, &c.

" SEC. 27. That the free communication of thoughts and opinions is one of the invaluable rights of man; and that every person may freely speak, write, and print, on any subject, being responsible for the abuse of that liberty."

An analysis of these sections will not justify the conclusions arrived at by appellant's counsel. We do not see that any one is forbidden to enjoy the fruits of his labor, but in doing so he must conform to the law; the State asserts her superior control over all her citizens. The third section is not authority for the doctrine contended for; by its plain import, it was simply intended to place persons of color on an equal footing with all others in regard to their religious rights—nothing more and nothing else. Nor can it be said that, by section nine, freedom of worship is destroyed. The conscience is left perfectly free in the enjoyment of its natural rights of independent, religious action. Whilst there may be a restraint to officiating as a clergyman upon a failure to comply with the law, there is no clog or fetter on the freedom of the mind or conscience. There is no intermeddling with the natural and indefeasible right to worship God according to the dictates of the conscience; none are compelled to erect or support any place of worship, nor to attend any particular church against their consent.

The Legislature of Pennsylvania passed a law prohibiting any person to " do or perform any worldly employment or business whatever on the Lord's day, commonly called Sun-

day, works of necessity or charity only excepted." There are a large class of Christians who conscientiously observe the seventh day of the week as the rightful Sabbath, and regard the first day as a day of labor, and who contended that the law was an infraction of the Constitution as interfering with the rights of conscience. As the clause in the Pennsylvania Constitution is almost identical with ours, we will transcribe it. The section runs thus:

"All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences. No man can of right be compelled to attend, erect, or support any place of worship, or to maintain any ministry against his consent. No human authority can, in any case whatever, control or interfere with the rights of conscience; and no preference shall ever be given by law to any religious establishment or modes of worship."

Yet the Supreme Court of that State, on several occasions, have held the law to be constitutional, and no interference with conscience or infringement of natural and indefeasible right.

In the last case, Specht v. The Commonwealth, (8 Barr, 322,) the court says: "The Constitution of this State secures freedom of conscience and equality of religious rights. No man living under the protection of our institutions can be coerced to profess any form of religious belief, or to practise any peculiar mode of worship in preference to another." In this respect, the Christian, the Jew, the Mahommetan, and the Pagan, are alike entitled to protection; nay, the Infidel, who madly rejects all belief in a Divine Essence, may safely do so in reference to civil punishment, so long as he refrains from the wanton and malicious proclamation of his opinions with intent to outrage the moral and religious convictions of a community, the vast majority of whom are Christians; but beyond this, conscientious doctrines can claim no immunity from the operation of general laws made for the government, and to promote the welfare of the whole people." In the language of Chief Justice Gibson, "the right of conscience,

as understood under our organic law, is simply a right to worship the Supreme Being according to the dictates of the heart; to adopt any creed or hold any opinion whatever, or to support any religion; and to do, or forbear to do any act for conscience' sake, the doing or forbearing of which is not prejudicial to the public weal." (Commonwealth v. Lesher, 17 Serg. & Ra. 160; enforced in Simmons v. Gratz, 2 Penn. 416.) Nor is any preference given to any particular church, all are placed precisely on a like foundation. A loyal man, as well as a disloyal one, may refuse to accept of the prescribed qualifications, and then he falls under the same disabilities.

But it is not necessary to pursue this subject further; even if an apparent inconsistency existed, we would not be warranted in declaring this part of the Constitution void. All of the different parts compose one instrument, which constitutes our organic law. The presumption is, that each and every part was intended to be so restrained and construed as to give effect to the whole. This is according to the well known rules of construction. It is a well established principle of law, that courts are not at liberty to declare an act of the Legislature unconstitutional and void, unless its repugnancy is clear and manifest. Respect for a co-ordinate branch of the government, the presumption that they have not transcended their powers or passed beyond the bounds of their legitimate sphere, invoke every intendment in behalf of their action. Every doubt is to be thrown in favor of the law. This is the rule in favor of ordinary enactments. (Adams v. Howe, 14 Mass. 345; *Ex parte* McCollom, 1 Cow. 564; Morris v. The People, 3 Denio, 381.) Now constitutional ordinances are high above mere legislative acts. (Butler v. Pennsylvania, 10 How. 415.)

It has been said by an eminent judge, when speaking of the subject of constitutional construction and of the powers of Conventions, " It was competent to deal—subject to satisfaction by the people, and to the Constitution of the Federal Government—with all private and social rights, and with all

the existing laws and institutions of the State. If the Convention had so willed, and the people had concurred, all former grants and charters might have been annihilated. When, therefore, we are seeking for the true construction of a constitutional provision, we are constantly to bear in mind that its authors were not executing a delegated authority, limited by other constitutional restraints, but are to look upon them as founders of a State, intent only upon establishing such principles as seemed best calculated to produce good government and promote the public happiness, at the expense of any and all existing institutions which might stand in their way." (In the matter of Oliver Lee & Co's Bank, 21 N. Y. 12, per Denio, J.)

But a direct appeal has been made to us to decide against the particular provisions in the Constitution under consideration, because they are contrary to justice and the fundamental principles of our institutions. With their justice or injustice, policy or impolicy, we have nothing to do. It is not for the judiciary to inquire whether laws violate the general principles of liberty or natural justice, or whether they are wise and expedient or not. They can only declare whether they are repugnant to constitutional provisions and limitations. It would be a violation of well established and safe principles for courts to resort to any other test. There is no higher law by which we can be governed. An attempt by judicial construction to obstruct a law, or a failure to enforce it, would be monstrous usurpation. We cannot make or repeal a law ; we are not entrusted with any such power. If it is wrong, unjust or oppressive, an appeal must be made to the people in their political capacity at the polls, to apply the remedy. We will not attempt to exercise judicial legislation. We can scarcely conceive of any thing that would be a compensation for introducing into our jurisprudence such a pernicious doctrine.

The most odious and dangerous of all laws would be those depending on the discretion of judges. Lord Camden, one of the greatest and purest of English judges, said, " that the

discretion of a judge is the law of tyrants; it is always unknown; it is different in different men; it is casual, and depends upon constitution, temper and passion. In the best it is oftentimes caprice; in the worst, it is every vice, folly and passion to which human nature can be liable."

Courts cannot go beyond their defined powers to avoid the hardship of extreme cases. The Constitution, in this instance, having prescribed all the essential details for its enforcement, a legislative act is not necessary.

The judgment is affirmed. The other judges concur.