**In the Matter of the Application of James G. GEORGE, Appellant.**

**No. WD33397.**

Missouri Court of Appeals,
Western District.

March 16, 1982.

Motion for Rehearing and/or Transfer to
Supreme Court Denied March 30, 1982.

Application to Transfer Denied
April 22, 1982.

Judith A. Sharp, Sharp & Scully, Kansas City, for appellant.

Michael E. Curley, Kansas City, guardian ad litem for natural mother, respondent.

Lee M. Nation, Kansas City, for guardian on appeal.

Before MANFORD, P. J., DIXON, and NUGENT, JJ.

DIXON, Judge.

This is the second appeal in a proceeding by the applicant, James G. George, to obtain a disclosure of the records of his adoption. The trial court has twice denied disclosure.

The sole and dispositive issue is the propriety of the trial court's exercise of his discretionary power to open the records under § 453.120 RSMo 1978 and *Application of Maples*, 563 S.W.2d 760 (Mo. banc 1978).

The prior appeal in this case is reported in *Application of George*, 625 S.W.2d 151 (Mo.App.1981). The opinion in that case contains a full account of the evidence on that appeal, which need not be repeated in detail in this opinion. The record in that appeal has been filed in this case. To the extent necessary for an understanding of this appeal, it will be summarized.

The applicant was adopted in the Juvenile Court of Jackson County in 1947 soon after his birth at a maternity center in Kansas City. He is approximately 33 years of age and his adoptive father is deceased. His adoptive mother and the applicant have waived any protection of the adoption records under § 453.120 RSMo 1978. His natural mother and his alleged natural father have refused to waive the protection of the statute.

The evidence at the prior hearing revealed that the applicant is suffering from chronic myelocytic leukemia, a term which is apparently synonymous with chronic granulocytic leukemia. This disease is commonly referred to as bone marrow cancer and the disease is a terminal one. One-half of the victims of the disease die within 40 months; one-half survive more than 40 months. The applicant so far as the record shows is in a state of remission. The initial treatment for the disease is pharmaceutical which is continued until the drugs no longer produce a remission, which may be "weeks," "months," or "years." The applicant has received this therapy. If the disease progresses, as apparently it ultimately will in every case, the patient's condition becomes one of acute leukemia and death will shortly occur. The medical profession has devised another form of therapy to induce a remission after the treatment by drugs has failed. This treatment is referred to as a bone marrow transplant, and it is ordinarily resorted to just before the disease transforms into acute leukemia. The testing will apparently disclose the stage and progression of the disease. Simply stated, the process involves the destruction of the diseased bone marrow of the patient and the injection of a bone marrow transplant from a genetically similar donor with the hope that the donor's marrow will produce healthy blood cells by replacing the diseased bone marrow. The procedure presents a high risk of failure even when the most genetically suitable donor is utilized, a full-blooded sibling. Somewhat over one-half of the patients survive when the donor is a full sibling. As between identical twins, the survival rate increased to about 80% demonstrating the necessity for as close a genetic match as possible. The crux of the medical testimony as to the manner of testing for finding a genetically suitable donor was stated in the prior opinion as follows:

The success of the procedure depends upon the acceptance by the patient's body of the transplanted marrow and that, in turn, apparently depends upon the degree of matching between the donor and the donee in what is referred to as the blood antigens. This is determined by a test for human leukocyte antigens (HL–A testing). There are five types of information utilized in the typing of the blood of the donor and the donee. These bits of information are located on the 6th chromosome, and these loci are referred to as the A, B, C, D, and DR loci. All but D are defined by usual serological testing procedures. D requires a test involving a mixing procedure with the patient's

blood. The "D" test is only done if a match occurs in the other four factors.

Complicating the question of compatibility between the donor and donee for purposes of transplant is the presence or absence of unknown antigens which have not yet been identified.

*George, supra* at 154.

Summarizing very briefly what is fully explicated in the prior opinion, the following seems to accurately reflect the medical opinion on the likelihood of finding a donor. Aside from identical twins, siblings present the best possibility. Parents rank below full blooded siblings and half siblings are below parents in the likelihood of matching. Typing to find a match would not be recommended beyond the relationships stated.

Based upon these remote possibilities and the conclusion of the court that *Maples, supra,* required the trial judge to exhaust the possibility of voluntary disclosure or voluntary offers of testing to determine the existence of a match, the cause was reversed and remanded with directions to the trial judge to contact the alleged natural father if that information was available and to accept from either the natural mother or the alleged natural father any volunteered information concerning HL–A testing of related persons.

The trial court has executed our mandate upon remand in a careful, compassionate, and competent manner. What now follows is gleaned from the transcript relating the activities of the court pursuant to that mandate.

Upon the return of the mandate, the court met with the attorneys to discuss the implementation of the mandate. At that time the court disclosed to counsel that the adoption records revealed the name of the alleged natural father and that the court believed that this person could be located. There was a brief delay while the applicant's counsel pondered the question of the disqualification of the judge and consulted her client. Then followed a discussion between court and counsel as to the manner of contact with the alleged natural father. This discussion was primarily to receive the suggestions of counsel as to the manner of contact with the alleged natural father. The court presented no preconceived plan and accorded full weight to the suggestions of counsel, including the suggestion that the court's wife be present at the meeting with the alleged natural father.

Within a few days, the court met with the alleged natural father. The results of that conference were related by the court for the record. Without attempt at summary or paraphrase, that portion of the record follows:

The alleged father was able to leave his work and we met with him privately and quietly identified ourselves and the purpose of our meeting and determined that he was the person that we were seeking, and then presented to him the two letters of communication which the Court had received from the applicant and his wife the preceding Monday. This man read those letters.

I might say, the Court had not seen the contents of those letters as they had been sealed and they were opened by this alleged father.

The meeting with the alleged father on that occasion lasted anywhere between four and five hours, and I'm confident that the presence of my wife enabled the Court to discuss this matter with the alleged father for that length of time.

I don't want to give the impression that the entire four to five hours was discussed—was spent discussing this particular matter entirely. In order to maintain a rapport and not break off communication, there were a lot of matters discussed, but always reverting back to the subject of our meeting.

I could describe this man's reaction as one of disbelief, shock, and denial. As more information was given to him relating to this matter, it was obvious to him who was the mother of the applicant.

He stated to the Court that he was not the father of the applicant, that the circumstances were such that he could not be his father, and that under those circumstances, he could be of no help to him,

and that he did not want to have anything more to do with the matter.

We prevailed, however, that he should discuss this matter with his wife, that it was entirely appropriate for her to know what the situation was, and we asked him to inform her of this matter and to allow us to meet with he and she to discuss the problem further. He finally agreed to this, and indicated that he wanted to speak with his wife first, and after that, he would be back in touch with us to let us know whether such a meeting was possible.

We did hear from him indicating that we could come visit he and his wife, and we did. This meeting probably lasted another five to six hours, and was—and took place in their home. The entire matter was again explained to the alleged father and to his wife. The letters sent by the applicant and his wife were again presented to the alleged father who gave them to his wife, and she read them. We continued to impress upon them the need for a bone-marrow donor for Mr. George, but the alleged father continued to assert that he was not the father, could not be the father, and that he could not help.

We were hopeful that perhaps his wife would be supportive of us in our desire to get his blood tested, but she supported her husband, and accepted her husband— and accepted his statement that he was not the father of the applicant.

During this visit many things were discussed besides the issue at hand in order to break the monotony and pressure and stress of the situation. For the record, we talked about many things; politics, economy, art, religion. You name it and we probably touched upon it in some manner or another. We even had many of the newspaper articles that were published here in the Greater Kansas City area, and also from some other publications over the State and nation. These were shown to the alleged father and his wife, and they did, in fact, read some of them. I'm confident that they were fully informed and were aware of the medical

circumstances of the applicant and his needs, and their final response was that they could not help and they did not want to be involved, and they did not want me to leave the letters addressed—the letters which were for delivery to the alleged father.

His response to that tender was that these were not intended for him because he was not the real father and that I should find the real father and deliver them to him.

I also offered to leave with them copies of the pleadings in this case, pleadings which Ms. Sharp and I had determined would be appropriate for delivery to him, basically that involving the initial application, the various affidavits which were filed in support of it, copies of certain letters which the applicant and his wife had previously written, but they refused to accept these documents as well.

My wife and I continued to pursue the issue, and we even went to dinner with this couple, and after dinner, again asked if it were possible that we could leave these documents and letters with them, and whether or not they would reconsider the possibility of blood antigen testing to determine compatibility, and they declined.

Thereafter, the court conferred with the attorneys and an arrangement was made to obtain blood tests of the mother and her child. The trial court, to preserve the anonymity of the natural mother arranged for the drawing of the blood by an unidentified registered nurse. The court attended and identified the samples with his initials, delivering them himself to the testing laboratory and directly to the physician who was conducting the tests. The necessary information as to the HL–A testing of the applicant for comparison purposes had previously been delivered to the doctor by the court and counsel for the applicant. An oral report and a written report were made to the court by the physician. This report negated a match between the applicant and his mother and half sister. The court afforded counsel an opportunity to meet with the

doctor who performed the tests. The physician was in charge of a local laboratory dedicated to testing for histo-compatibility and organ retrieval services in this area.

After this conference, the court again contacted the alleged natural father to see if he would consent to blood tests, and the alleged natural father refused.

Perservering still in the effort to obtain the consent of the alleged natural father to such testing, the court wrote a letter to the alleged natural father. In that letter, the court again called attention to the plight of the applicant and his need for a donor. The court pointed out that regardless of paternity, the need justified help from anyone. The court then offered to have his own blood tested and that of his wife along with the alleged natural father and his wife. The court offered conditions of anonymity and guaranteed that the sex and identity of the persons tested would be unknown to anyone but the court and the alleged natural father. Further assurances were made that no test or opinion would be given or sought as to paternity. The alleged natural father contacted the court and rejected the proposal and indicated he would put his statement in writing. The court did not urge him either way to do so, but he did do so, and his written response, included by the court in the record, is as follows:

Dear Judge Martin:

If I were to give you a deposition, this is what I would say:

After our two conversations and after having re-read your letter, I have reached the following conclusions:

First, that I want to say that I have every compassion for the person with the horrible disease, and I agree whole heartedly on our responsibility to serve and help others, but, in this case, I have been put in a special category. The only reason that I have been asked to do this is due to the thirty-five year old allegation which is mathematically impossible. I deny completely this allegation with a clear conscience. I am sure that I have been used to cover someone else's actions.

.    .    .    .    .

In December I will have been married (very happily) 35 years to the very same intelligent woman.

Judging from the newspaper clippings that you showed me, and from the TV coverage that you said occurred, one would conclude that this whole situation has become theater. This is a sad predicament and indicates that an unfortunate, seriously ill human being has become the pawn of a group dedicated to break Missouri's law of confidentiality. Shattering this law is more important than finding real and immediate help for this sick man.

Judge, I am aware of your position in this matter, and I have compassion for you. Surely you are aware of the position these allegations have put upon me and my family. I'll say again, as I did when I handed the letters and papers back to you, "You are talking to the wrong person; so look elsewhere, not here." Continuing this any further with me is useless. It certainly won't help the person with the dreaded disease, and could turn into a regular witch hunt. I can see now where the law is good in protecting the innocent.

I served my country about four years in World War II and came out with an honorable discharge as an enlisted man, also with a certificate of service as an officer and gentleman. So on my honor, I state the above is true to the best of my ability.

After this recital for the record, the court submitted himself to questioning by counsel for the applicant and the natural mother. That questioning developed that the name of the alleged natural father came from the adoption records, and that the natural mother has never divulged to the court the name of the father. The court asserted that a confrontation with the alleged natural father would be "counter productive" whether by the "court," the "applicant," or "anyone else." The court revealed upon examination that he had not disclosed the name of the natural mother to the alleged father and that the court was sure they were discussing the same individual.

THE COURT: Just by various comments made about the past, his familiarity with her circumstances, the fact that as everybody knows, she had two daughters, one of whom was dead. I am confident we were both talking about the same person, the same woman.

. . . . .

. . . In that connection, I might state that he indicated no animosity towards her for having named him as the alleged father, and he tried to understand why she may have given his name.

The court then called as the court's witness the physician who conducted the blood tests of the natural mother and her child. After qualifying him as an expert, the court asked the doctor whether, based on the report of his findings and the data on Mr. George's blood, either the mother or the daughter would be a suitable donor. The physician said neither would be. As to more distant relatives on the mother's side, the doctor said the chances were "extraordinarily remote."

The doctor was then questioned by the court as follows:

Q Assuming that Mr. George has a father, a living father, and two children by a woman not the mother of Jim George, do you have an opinion based upon your experience and training, and based upon a reasonable medical certainty as to whether or not there's a reasonable likelihood of an HL–A match between the alleged father and his children with Mr. George?

A I do not believe that there's a reasonable chance of that occurring.

The doctor, on cross examination conceded that if the "D" locus of applicant and his mother matched, "it would be feasible" to consider her as a donor. Based upon his experience in his laboratory since 1969, he had not observed such a match between parent and child. He gave as his medical opinion that the chances of such a match were "extraordinarily rare." Based upon the fact that the applicant's natural mother had certain rare haplotypes which would have to occur in any wife of the natural father, to produce children with the necessary genetic match, the doctor said that the chances of those haplotypes occurring was less than .00026 in a million persons. Additionally, the "D" locus would have to match and in a thousand persons who are not related, less than 10 would be truly identical. These figures justify the earlier verbalizations of the doctor, "extraordinarily rare" and "statistics against this are astronomical." Because of this unfortunate circumstance of the rarity of the blood characteristics of the natural mother, the chance that any half siblings on the father's side might provide a suitable match theoretically seem to be less than one in a million, and not, as the applicant suggests, "greater among his birth father's family."

On the basis of the earlier record and the second record, the trial court denied the application to open the records so as to provide the applicant with the identity of his natural mother and the alleged natural father.

In making this determination, the court recognized that he was exercising his discretion under all the facts. The court found, based upon the evidence, that neither the mother nor the half sister could be donors and the remote chance of another maternal relative matching was "negligible" or "nil." A match with the putative father, the court found, was only "slightly better than impossible." The probability of a match with half siblings on the father's side was "unlikely."

These findings are all more than amply supported in this record and, in fact, the last finding recited is the most favorable to the applicant that is possible under the present state of the evidence. The court's expert with knowledge of the rare haplotypes possessed by the natural mother estimated the probability as less than .00026 in a million—"an unknown number but it will become very small."

Before commencing an analysis of the applicant's points on this appeal, it will be well to restate what *Maples* as the controlling authority dictates as to the consid-

eration of the issue here presented. In *Maples*, the Supreme Court was considering the refusal of a trial court to open adoption records. The Supreme Court considered the lower court's order to be a construction of § 453.120 RSMo 1978 as a blanket prohibition of the disclosure of records in any circumstances. The order of the trial court was reversed, and the cause remanded for a hearing. In ordering the reversal upon this basis, the court said:

> The statute (§ 453.120) on the other hand presupposes in a proper case that information should be released from the adoption records. To interpret the section as the trial court has done, distorts its meaning and denies the exercise of judicial discretion authorized therein.
>
> [7–9]. The court on good cause shown may release such portions of an adoption proceeding record as it deems necessary to satisfy the needs of the applicant when measured against the rights of the natural parents, the adoptive parents and the societal need to protect and maintain a viable system for adoption.

*Maples, supra* at 765.

■ Because the case was being remanded, the *Maples* court went on with specific directions to the trial court as to the procedures to be followed prior to adjudicating a disclosure. It was the direction of *Maples* to the trial court in that case upon which our former opinion rested. This court read *Maples* then, and still does, as requiring that a trial court exert every proper effort to either obtain consent to disclosure or obtain if possible necessary information without disclosure.

Our prior opinion implicitly recognized that a need might be established for release of information short of identification of the parents. That opinion also recognized that voluntary disclosure could not be prevented by the statute which protects only the record facts and does not attempt to control communications of fact known to the parties. Nothing prevents a voluntary disclosure by the natural mother of her own identity, now that the applicant has been identified, except her own desire for anonymity.

Our prior opinion directing the trial court to determine, if possible, the existence of genetically appropriate donors and to attempt to obtain consent to disclosure was thus based upon the premise that good cause had been established by the need of the applicant to take the limited action our mandate directed. That opinion did not and could not address the issue of ultimate disclosure of identity. That issue might never have been reached depending upon the result of the trial court's action upon remand.

The trial court has now complied with that directive. Information has been obtained, at least as to the natural mother, unfortunately not of assistance to the applicant. Consent from either the natural mother or the alleged natural father has not been given but has been explicitly refused.

■ The issue is whether the trial court abused its judicial discretion in refusing to release the identity of the natural mother and that of the alleged natural father.

*Maples* directed a different and more stringent test for the issue now presented.

> The disclosure of some information does not require the record be thrown open, instead, only so much information as the court adjudges necessary for the good cause shown need be disclosed. Information as to the *identity* and *whereabouts* of the natural parents, the adoptive parents or the adopted child may be released only under compelling circumstances and further the court is encouraged to obtain the consent of such persons if possible. . . . [I]f waiver of the confidentiality of the records as to their "identity or whereabouts" is not obtained, such fact should be shown great deference by the court. It is difficult to perceive a case in which circumstances would warrant disclosure of that information unless such waiver is had.

*Maples, supra* at 766.

■ Parenthetically, it should be stated that the balance is to be made as between

the factual circumstances disclosed by the applicant and an abstract principle. The specific circumstances of the instant parents are not to be considered. In fact, they cannot be considered. No record exists upon which those interests could be determined. What is to be balanced then is the factual need and the *policy* against disclosure.

■ The policy interest is the maintenance of a viable system of adoption which will cause natural parents to seek the protection of that system rather than obtain some measure of anonymity by resorting to private adoptions arranged by go betweens of various sorts. What fosters that reliance upon the statutory system is the reliance of the parties upon the statutory command against disclosure. Among all the information that is contained in an adoption file, none is of more importance in serving the policy function of the statute than the "identity and whereabouts of the natural parents" as *Maples* recognizes. If such persons do not waive "confidentiality of the records as to their identity or whereabouts," this fact is to be shown "great deference."

The trial court then in exercising the discretion committed to it must balance this policy against the compelling circumstances shown by the applicant.

The applicant on this appeal asserts that no matter how minimal the chances of locating a suitable donor, the fact that locating such a donor is his only chance overcomes the policy of the statute. Applicant adroitly sidesteps the obvious disinclination of the alleged natural father to even be tested let alone become a donor by asserting that the "siblings" are the best potential donors, and that they are entitled to make such a choice themselves. This ignores two rather obvious facts. There are no "siblings," only "half siblings," and for any such half siblings to be prospective donors, an almost impossible coincidence as to the blood haplotypes of the natural mother of these half siblings must have occurred.

Upon the basis of this, the applicant urges that this court find that the trial court "abused his discretion."

This brings into sharp focus the only issue this court is free to consider on this appeal. Our task is to apply the law relating to the review of a discretionary act by a trial court and determine if the discretion has been properly exercised.

In order to undertake that review, the nature of an act of judicial discretion and the scope of review of such an act must be determined. An appellate ruling on review of a discretionary matter is often stated as a finding of an "abuse of discretion" or conversely as a finding of "no abuse of discretion." The rubric "abuse of discretion" adds little to an understanding of the nature of the reviewing process. What is really intended by the expression, "abuse of discretion" is both a statement of the limited nature of appellate review and a shorthand expression of the result of that review. Judge Clemens, in *Anderson v. Robertson*, 402 S.W.2d 589 (Mo.App.1966) synthesized the principles of a review of an act of judicial discretion as follows:

Paraphrasing the rulings of this court in *Harriman v. Harriman,* Mo.App., 281 S.W.2d 566[4], and that of the Supreme Court of Alabama in *Mullins v. Board of Education of Etowah County,* 249 Ala. 44, 29 So.2d 339, we say first that judicial discretion is the option the trial judge has in doing or not doing a thing which cannot be demanded by a litigant as an absolute right. In a minority of early American cases it was held that matters resting in the judicial discretion of a trial court could not be reviewed on appeal. Such a principle, however, would cast the trial judge in the role of a tyrant—a role repulsive to the principles of justice. *State v. Cummings,* 36 Mo. 263, l.c. 278, 279. Early Missouri cases rejected the minority rule. Our courts joined the majority in adopting the principle that discretionary matters are reviewable because "the ultimate responsibility for every judgment rests upon the court of final resort." *Feurt v. Caster,* 174 Mo. 289, 73 S.W. 576[2]. See Bowers, The Judicial Discretion of Trial Courts, § 16, p. 29.

... Reverting now to the *Harriman* and *Mullins* cases, *supra*, we say that judicial discretion is abused when a trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. It is, however, a principle deep within our law that on appeal from a trial court's discretionary ruling it is presumed that the ruling is correct, and that the burden of showing abuse of that discretion is on the appellant. *Stewart v. Small*, 5 Mo. 525, l.c. 528; *Funkhouser v. How*, 18 Mo. 47, l.c. 49; .... When appellate courts are called upon to apply this test, it is well to heed the words: "If reasonable men could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." *Delno v. Market St. Ry. Co.*, C.C.A. 9th Cir., 124 F.2d 965, 967. Bowers, The Judicial Discretion of Trial Courts, §§ 12 and 17, pp. 20 and 33. *Anderson, supra* at 592–93.

The above quotation demonstrates that although Missouri law authorizes appellate review of an act of judicial discretion that review is limited by the nature of discretionary action. Attempts at description of this review limiting function of the discretionary act are sometimes indicated by language characterizing the act as one within the "wide" or "broad" discretion of the court.

■ Once it is determined that there are alternative courses or choices open to the trial court and that any of those choices yield a result not contrary to law, then the review is complete; the trial court will be affirmed, no matter which choice is made.

Analysis of instances of a finding of an "abuse of discretion" invariably yields the conclusion that in the given case the alternative actions were not available. The lack of a factual basis for truly alternative choices may cause reversal. *State ex rel. State Highway Commission v. Gould*, 592 S.W.2d 172, 175 (Mo.App.1979). Likewise, a trial court may mistake the boundaries of discretionary action. When the issue is the discretionary power of the trial court to rule upon the admission of evidence upon the ground of relevancy, the discretion applies only to a narrow range of such questions. A trial court does not have "discretion" to exclude highly relevant and probative evidence. *Stapleton v. Griewe*, 602 S.W.2d 810 (Mo.App.1980).

The commonly used expression for testing the exercise of discretion—that if reasonable minds could differ on the choice to be made, the discretion will be upheld—is but a definition of the existence of discretion and its scope.

The review process is not an act of appellate second guessing. Review consists of a determination of the existence and scope of the discretion. If the judicial act in question is an act of discretion, that is, one not of right, and is within the scope of the discretion, the choice of the trial court will be accepted.

*Maples* declares that the trial court has discretion to open the records or order their continued closure. The scope or area of that discretion is not otherwise defined in *Maples* except to direct the balancing of the policy of the statute, expressed as the privacy interests of the parties, against the compelling circumstances of the applicant.

The applicant argues that because of the life threatening nature of his disease the balance must be struck in favor of disclosure. This argument is really directed to the proposition that there is no factual basis for any result other than disclosure or stated in another way that under the facts of this case the scope of the discretion did not permit the trial court to refuse disclosure. The argument assumes that the only fact to be considered in determining the compelling circumstances is the "need" of the applicant. That is not, however, the entirety of the "compelling circumstances." The possibility of disclosure being of any assistance in the satisfaction of the applicant's need must also be considered. The evidence amply demonstrates that the possibility that disclosure would result in any benefit to the

applicant is so remote as to be very nearly non-existent. There is really a compound factor of improbability. It is improbable that the natural father will ever be identified and if that identification resulted in the determination that the natural father is the alleged natural father, it is improbable that he would assist. Added to these uncertainties is the scientific evidence demonstrating that the likelihood of a genetic match is so remote as to be classified only as an improbability of the highest order.

■ The instant case presents a situation in which reasonable men might differ as to the efficacy of disclosure. So viewed, the act of the trial court was within the scope of the discretion conferred by *Maples.*

The applicant has raised a plethora of issues in the brief, all but one of which need no discussion here since the issues raised are a reargument of the issues raised and decided by *Maples.*

■ The single issue which requires mention is the assertion that the procedures employed by the trial court were somehow unfair to the applicant. Coupled with that assertion is a more muted claim than that made on the prior appeal—that the trial court's action gave the "appearance of impropriety" because of the court's involvement in the attempt to obtain voluntary disclosure. Everything else aside, it comes with little grace for the applicant to denigrate the efforts of the trial court. Without equivocation, those efforts are to be characterized as diligent and proper efforts to comply with the mandate of this court. To the extent that the argument raises again the issue of a third party intermediary the rejection of that position in our previous opinion is reiterated and affirmed.

In any event, the applicant participated in the determination of the procedures undertaken and will not be now heard to complain of some supposed deficiency not urged in the trial court. Nor does the applicant suggest, aside from the rejected notion of an intermediary, any different procedure compatible with the directive of *Maples.*

Judgment affirmed.

All concur.