Application of Annetta Louise MAPLES.

No. 60187.

Supreme Court of Missouri,
En Banc.

April 10, 1978.

John F. Michaels, Kansas City, for appellant.

James O. Swaney, Jr., Kansas City, for respondent.

RENDLEN, Judge.

Annetta Louise Maples applied to the Circuit Court of Jackson County for an order to open the records of her 1949 adoption under authority of § 453.120, RSMo 1969. That section provides:

"The files and records of the court in adoption proceedings shall not be open to inspection, or copy, by any person or persons, except upon an order of the court expressly permitting the same and pursuant to written application."

She was less than one year of age when placed with her adoptive parents and not yet two when a decree was entered finalizing her adoption as the lawful child of the new parents. During her youth appellant learned of the adoption and troubled by this knowledge she eventually, when twenty-eight years of age and financially independent, moved to open the records. Appellant concedes she had not sought such information from her adoptive parents nor had she asked them to see the "adoption papers . . . because they would be hurt." However, risking that hurt and the possibility of disturbing their relationship, she commenced a search for her natural parents in 1973 requesting information from the Jackson County Family Children's Services Social Agency concerning her "birth specifics." In response the supervisor of the adoption services of the Jackson County Juvenile Court provided much background information as well as particulars concerning the health and physical condition of her natural parents and later a certified copy of the decree of adoption. Not content with this, Miss Maples applied for an order to inspect the entire record under § 453.120 and at the conclusion of the hearing that followed, the court denied her application.[1] The cause was heard ex parte as no provision appears in the statute requiring an adversary proceeding; yet in an appropriate case, as hereinafter discussed, persons concerning whom information is sought from the records should be afforded an opportunity to participate in the proceedings.

An appeal was lodged with the Kansas City district of the Court of Appeals and transferred to this court prior to opinion under Art. V, § 11 of the Missouri Constitution of 1945 as amended. A copy of the notice of appeal was delivered to the Department of Juvenile Services of the Jackson County Circuit Court and that office determined to appear as Respondent, effectively (though not formally) representing the interests of the state, the natural parents and others whose interests might be affected.

Appellant contends: (1) Section 453.120 is unconstitutional in that it impermissibly abridges her (a) First Amendment right "to receive" information, (b) Fourteenth Amendment right to "liberty" and "privacy" and (c) Fourteenth Amendment right to "equal protection of the law." (2) The trial court, construing the statute too narrowly,

---

1. The application was styled "In Re: Adoption of Annetta Louise Maples" but more appropriately the captions of such cases should be "In the Matter of the Application of _____ (name of applicant.)"

improperly denied itself authority to exercise discretion when determining the cause on its merits.

■ Conceding in oral argument that her challenge to the statute's constitutionality rests principally on the trial court's narrow construction of the section, appellant nevertheless insists that though a broader statutory interpretation might be adopted, she does not waive the constitutional issue. Respondent, on the other hand, maintains that because the application contains no reference to the constitutional issues and because they were not argued to the trial court, they are not cognizable on appeal. This argument overlooks the fact that with her application appellant filed an "affidavit" and "memorandum of points and authorities" which by reference were expressly incorporated as a part of the pleading; these sufficiently raised the constitutional issues at the trial level and respondent's contention is without merit.

## I—THE CONSTITUTIONAL ISSUES

■ Appellant first contends the statute is violative of her First ·Amendment right to receive information. Generally it can be said the First Amendment protects the right to receive information and ideas, and as held in *Martin v. Struthers,* 319 U.S. 141, l.c. 147, 63 S.Ct. 862, 865, 87 L.Ed. 1313 (1943) the state may not indulge "the naked restriction of the dissemination of ideas." There the court invalidated a city ordinance limiting distribution of handbills and advertising matters and held it was not justified by the minor nuisance caused the community in clearing litter from its streets. The court however added, "[y]et the peace, good order, and comfort of the community may imperatively require regulation of the time, place and manner of distribution." l.c. 143, 63 S.Ct. 863. Appellant also cites *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) which struck a Georgia anti-obscenity statute and *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) declaring unconstitutional a Connecticut statute forbidding the use of contraceptive devices and reversing the

conviction of a licensed physician who advised his patient, a married woman, on the best contraceptive for her use. In these cases the state forbade the free flow of ideas from *one person to another.* Such is not our case. The information sought here is the product of the judicial process, gathered under the scheme of the adoption laws. Control of these records to promote this highly desirable system stands in contrast to the prevention of the transfer of handbills, films or medical advice from one person to another in the manner of the statutes in the cited cases. It was the state's interference with the interchange of ideas and materials between persons that the Court invalidated in *Stanley* and *Griswold* as violative of the individual's First Amendment rights. In the case at bar, the state's protection of the adoption process by control of its judicial records does not rise to the level of an unconstitutional infringement of appellant's First Amendment right to receive information but rather is the exercise of a valid state interest, balancing conflicting rights of privacy and protecting the integrity of the adoption process which could suffer if the confidentiality of the records were diminished.

■ Applicant next argues her right to "liberty" and "privacy" as protected by the First and Fourteenth Amendments to the United States Constitution is abridged by the statute's interference with her "family relationships." She relies on *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) wherein a Nebraska statute prohibiting the teaching of any modern foreign language to children prior to the ninth grade was declared unconstitutional. Also cited is *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) in which the Court held the Texas criminal law proscribing the procuring of abortion except on medical advice for the purpose of saving a mother's life was violative of the due process clause of the Fourteenth Amendment. The Court there found the Fourteenth Amendment protects the right of privacy, including a woman's qualified right to terminate her pregnancy, and the state could

not override such right in the manner of the Texas statute; the Court added however, that the state had a legitimate interest in protecting both the pregnant woman's health and the potentiality of human life, each of which grew and reached a compelling point at some stages during the pregnancy. Appellant's reliance on these cases is misplaced. In *Meyer,* it was the flow of information from teacher to student which the state improperly abridged under the Nebraska statute. Similarly, through the Texas Criminal Statute the state invaded the private life of the pregnant mother, interrupting the free flow of medical advice from her doctor and restricting her actions under that advice. Here, something quite different occurs; the natural parents' right of privacy is shielded by the statute but appellant insists the state strip the anonymity they believed was theirs and divulge the information received under a conditional cloak of confidentiality. It is important to note, that we quite properly are not told and need not know if the natural parents consented to the adoption or the parental rights were severed by reason of abandonment or neglect. But for whatever reason, the state at the behest of those concerned undertook through the adoption process to sever the parental relationship, award custody and establish a new relationship of parent and child. Much of the information coming into the court's records during that process is for good reason treated as a confidence, offering a fresh start to the parties so that natural parents making this agonizing decision are assured the parent-child relationship will be completely severed, both legally and socially and may put behind the mistakes and misfortunes precipitating this fateful act. They are assisted in this traumatic experience by the knowledge that the records may be compromised only on order of court and that neither the child nor the adoptive parents may question why they consented to the adoption or the circumstances of the abandonment or neglect. If it were otherwise, the adopted child might reenter their lives with disastrous results. There must be finality for the natural parents and a new beginning; if

there is a right of privacy not to be lightly infringed, it would seem to be theirs. Graphic examples of the natural parents' need to privacy come readily to mind. Assume an illegitimate birth followed by adoption and thereafter the natural mother marries and has children by that marriage. Should the adopted child be permitted, through state action, to present himself at the home of her new family and lay bare the tragic secrets of the past? We think not. Or consider the situation in which a married woman, whose husband is absent, (perhaps overseas in the Armed Services) and through an adulterous relationship bears a child whom she promptly places for adoption. Must not the law permit this sorry person privacy without fear of the natural child's appearance at her family home with its potentially disastrous effect? Only an affirmative answer seems possible and the privacy must extend to the members of the family, if the natural parents are dead, who in the sound discretion of the court would be adversely affected by disclosure.

The primary concern of the state must be to protect and foster an effective scheme for adoption, thus serving the best interest of the child. This concern is well expressed in the following statement from the Family Law Quarterly, Vol. XI, Number 2, Summer 1977, pp. 196–197.

> "The primary interest of the public is to preserve the integrity of the adoptive process. That is, the continued existence of adoption as a humane solution to the serious social problem of children who are or may become unwanted, abused or neglected. In order to maintain it, the public has an interest in assuring that changes in law, policy or practice will not be made which negatively affect the supply of capable adoptive parents or the willingness of biological parents to make decisions which are best for them and their children. We should not increase the risk of neglect to any child, nor should we force parents to resort to the black market in order to surrender children they can't care for.

"The public's interest is relevant as much to the appropriate pace of change as it is to the nature of the change. For example, even if there was general agreement that adoptees should have access to otherwise sealed records, we must still determine whether overly rapid movement in that direction would undermine the goals of adoption itself. In addition, the public interest requires that more research be done to determine the effect of policy change on the attitudes of adoptive parents and biological parents.

"No one has yet shown that decades of policy protecting the anonymity of the biological parents and the security from intrusion of the parent-child relationship after adoption have been misguided. Quite the contrary. The overwhelming success of adoption as an institution which has provided millions of children with families, and vice versa, cannot be easily attacked.

"The public has a strong interest, too, in preserving the confidential non-public nature of the process. Public attitudes toward illegitimacy and parents who neglect or abuse children have not changed sufficiently to warrant careless disclosure of the circumstances leading to adoption.

"But the public also has an interest in the mental health of children who have been adopted—in order that they not become burdens to society. Some provision for the relatively small group of adoptees whose psychological needs are compelling would appear necessary."

In the case at bar, the adoptee has prospered socially, intellectually and financially as the child of her adopting parents and has recently married. No compelling psychological need appears suggesting a problem of "mental health" resulting from the adoption or the confidentiality of the records that would render her a "burden to

society." In addition, it should be stated that adoptive parents need and deserve the child's loyalty as they grow older and particularly in their later years. The statute promotes a posture from which the child's attention and emotional attachments are directed toward the relationship with the new parents and so it should be. Appellant's contention is denied.

The final constitutional challenge concerns an alleged violation of appellant's right to "equal protection of the law" under the Fourteenth Amendment. She insists "strict scrutiny" of this statute is required when determining its constitutionality for the reason it classifies and invidiously discriminates against her as an adoptee which she claims is a "suspect criteria" i. e., "status at birth." Appellant erroneously equates her "adoption" at age one year and eleven months with a "status at birth" (e. g., legitimacy, sex and race) and in addition it is not clear how she relates this concept to an alleged impermissible control of adoption records. She relies on *Weber v. Aetna Casualty & Surety Co.,* 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972) wherein the Supreme Court invalidated a Louisiana Workmen's Compensation statute denying illegitimates compensation benefits not denied those legitimately born; and *Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) in which the Supreme Court struck down, as violative of the Fifth Amendment's due process clause, a federal statute discriminating on the basis of sex.[2]

While the cited cases seem inapposite and the "status at birth" argument unduly attenuated, appellant does focus on the "equal protection" issue by posing this question: "Why should I, as an adopted child, not be permitted to ask who my natural parents might be, just as a nonadopted child might so ask?" In this sense there is a difference, as the statute concerns only the

---

**2.** Appellant relies on the plurality opinion of *Frontiero v. Richardson,* which stated that sex is a suspect class. The Supreme Court on three occasions since *Frontiero* has considered the issue of whether sex is a suspect class. These cases, *Kahn v. Shevin,* 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974); *Schlesinger*

*v. Ballard,* 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975); and *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 1161, 51 L.Ed.2d 574 (1976), cast substantial doubt on the precedential value of the plurality opinion in *Frontiero* concerning the referenced issue. (See also, Note, 42 Mo.L.Rev. 470 (1977)).

adopted child, but this and other differences between the adopted and the nonadopted child which we shall hereinafter discuss, do not constitute "invidious discrimination" and denial of equal protection in the constitutional sense.

Applicant as a child has been neither abandoned nor neglected by the state. She and others like her have been given special advantage extended only children placed for adoption. At birth she had no status under this law different from other children. It was her natural parents' duty to provide for her care and support and when they failed or refused in those responsibilities the state, through the adoptive process, provided new parents. The decree makes the child for every purpose that of the adoptive parents as completely as though born to them in lawful wedlock. All legal relationships and all rights and duties between such child and the natural parents cease, *Wailes v. Curators of Central College,* 363 Mo. 932, 254 S.W.2d 645 (1953), except when a natural parent is a petitioner in a step-parent adoption proceeding. The child inherits from the adoptive parents and, if a minor, is entitled to their support and care, while they in turn are capable of inheriting from him and are entitled to his services and to his custody and control. § 453.090, RSMo1969. Such is not discriminatory treatment under the law, instead the state provides a system for the protection of neglected or abandoned children, as well as those given voluntarily for adoption. In developing the system, the legislature perceived a need for confidentiality of the records and the adopted child is not singled out and he alone prevented from perusing the records, instead the prohibition applies equally to the parents (adoptive or natural) or a curious interloper seeking to invade the sanctuary provided by the statute. None should be permitted to exploit the record of tragic events which necessarily find their way into many adoption proceedings. The interest of the state in protecting all concerned and in maintenance of a viable system of adoption is the manifest purpose of the statute. This system presents no invidious discrimination or denial of constitution-

ally protected rights and appellant's contention is denied.

## II—THE STATUTORY ISSUE

Appellant's final contention is that the trial court, by narrowly construing the statute, unduly restricted its authority thereby stultifying the exercise of its discretion. This contention is premised on her interpretation of the trial court's remark that it could not in any adoption case "release the information requested", found in the court's letter to counsel of September 27, 1976, which is in pertinent part:

"The same reasons for maintaining confidentiality in this case exist *in every case* in this jurisdiction. The Court was a party to a contract at the time of Termination of Parental Rights and Adoption, and to breach its part of that contract would purely and simply be avoiding its responsibility to a party who cannot now be given a voice in the present proceeding.

"The Court regrets that it *cannot release the information requested.*

"Petitioner's Application is denied." (Emphasis ours.)

No other findings of fact or conclusions of law appear, and from that letter applicant justifiably concluded the court construed the statute as a blanket prohibition against disclosure of the records under any circumstance. The statute (§ 453.120) on the other hand presupposes in a proper case that information should be released from the adoption records. To interpret the section as the trial court has done, distorts its meaning and denies the exercise of judicial discretion authorized therein.

■ The court on good cause shown may release such portions of an adoption proceeding record as it deems necessary to satisfy the needs of the applicant when measured against the rights of the natural parents, the adoptive parents and the societal need to protect and maintain a viable system for adoption. The closing of such records by statute, manifests a legislative intent that any opening or disclosure be

with caution. The burden is applicant's to show good cause, and only a proper showing and within the guidelines hereinafter discussed may information be made available therefrom. The disclosure of some information does not require the record be thrown open, instead, only so much information as the court adjudges necessary for the good cause shown need be disclosed. Information as to the *identity* and *whereabouts* of the natural parents, the adoptive parents or the adopted child may be released only under compelling circumstances and further the court is encouraged to obtain the consent of such persons if possible. The court through its juvenile officer or other functionary under its control may, when the factual situation justifies, institute a confidential inquiry of those concerning whom the information is sought and if waiver of the confidentiality of the records as to their "identity or whereabouts" is not obtained, such fact should be shown great deference by the court. It is difficult to perceive a case in which circumstances would warrant disclosure of that information unless such waiver is had. The persons whose waiver is sought should, if possible, be fully advised by the court of the pending action and afforded the opportunity to be represented in that proceeding, yet maintain their anonymity. The court in an appropriate case should appoint a guardian ad litem.

Clearly the court misinterpreted the statute, effectively negating the exercise of its discretion. However, plaintiff has been furnished much information concerning her natural parents including medical data and a copy of the adoption decree. On the record here, which shows little more than a thinly supported claim of a "psychological need to know", the identity and whereabouts of the natural parents should not be disclosed unless their consent is obtained through the process hereinabove discussed. The cause is remanded for further proceedings not inconsistent with this opinion.

HENLEY, FINCH and DONNELLY, JJ., and HOUSER, Special Judge, concur.

BARDGETT, J., concurs in result in separate opinion filed.

SEILER, J., concurs in result in separate opinion filed.

MORGAN, C. J., not sitting.

BARDGETT, Judge, concurring in result.

I concur in the disposition made of the constitutional issues by the principal opinion and agree that the cause should be reversed and remanded on the basis of the statute which authorizes the court to release information contained in the records. However, I do not believe an adopted adult seeking the identity of his natural parent or the natural parent seeking the identity of her natural child should have the heavy burden indicated by the principal opinion merely to get the juvenile court to inquire of the other whether they are agreeable to the information requested. The inquiry ought also go to the adoptive parents; but, after the child is emancipated, the desires of the adoptive parent to continued confidentiality would not necessarily be as weighty as the agreement of the adopted person and the natural parent that they know the identity of each other. That step, in the instant case, has not yet been taken and, in my opinion, it should be attempted before further hearings take place.

Generally, I am in agreement with the broader approach taken by Judge Seiler in his opinion concurring in result but do not, at this time, desire to indicate agreement or disagreement with the "sliding scale" announced therein because I do not clearly understand it.

I concur in result.

SEILER, Judge, concurring in result.

I fully concur in the proposed disposition of remanding this cause for the hearing of additional evidence. However, in the exercise of the trial court's discretion I would be less rigid and permit more flexibility as follows:

I note briefly the current fascination with the profound achievement of author Alex Haley in his recorded search for geneologi-

cal roots.[1] These sensations of the consciousness of personal history are ample testimonials to the unique anxiety of Americans in discovering our origins; for we are, with rare exception, a nation of uprooted immigrants whose family crests are little more than the remnants of graffiti on the steerage deck walls of a generation of vessels.

All of us need to know our past, not only for a sense of lineage and heritage, but for a fundamental and crucial sense of our very selves: our identity is incomplete and our sense of self retarded without a real personal historical connection.

Is there any reasonable justification for us to prevent, in perpetuity, the geneological self-discovery of those among us who were adopted?

"It is too often forgotten that an adopted child eventually grows up . . . [We need not assume] that what was in an adoptee's best interest as a child is also in his best interest as an adult. While confidentiality is . . . [undoubtedly] in the best interest of the child adoptee, it is questionable whether insistence upon confidentiality remains in his best interest after he has reached adulthood . . . Adoptees often suffer from what has been termed 'geneological bewilderment.' As a consequence, they become preoccupied with existential concerns and a feeling of isolation and alienation due to the break in the continuity of life through the generations that their adoption represents." Note, Sealed Records in Adoption, 21 Cath.Law. 211, 217–18 (1975).

For many adoptees, the skeletal trace of background information would be of sufficient scope. Yet others will want and need to explore further, not satisfied by the cold responses of a social agency case worker, and inquire as to the identity of their mother, their father, and the existence, if any, of brothers and sisters. *See* Note, Discovery Rights of the Adoptee—Privacy Rights of the Natural Parent: A Constitutional Dilemma, 4 San Fernando Valley L.Rev. 65, 68 (1975).

"It is generally assumed that a biological parent who relinquishes a child for adoption wants to forget the entire experience and start a new life. Research indicates, however, that this is often not true. Many biological mothers, for example, periodically inquire about their children's welfare at the agencies that handled the adoption. In a recent study of the effects of sealed-record adoptions, many biological mothers expressed a desire to share with their children current information about themselves and to receive reports concerning their children's welfare." Note, Sealed Records in Adoption, 21 Cath.Law. 211, 226 (1975).

We are presented in these cases with competing interests: those of the adoptee, the natural parents, and the adopted parents. The statute requires a showing of "good cause" as a predicate to the opening of records, and "good cause" can in no sense be understood to be automatic.

I would require the court on good cause shown to release such portions of an adoption proceeding record as it deems necessary to satisfy the needs and interests of the applicant when measured against the interests of the natural and adopted parents. The closing of such records by statute manifests a legislative intent that any opening or disclosure be with caution. The court through its juvenile officer or other functionary under its control would institute a confidential inquiry of those concerning whom the information is sought and so seek a waiver of the confidentiality of the records as to their identity and whereabouts.

The applicable standard would be the following: Such interests as are presented by the natural parents will predominate and be most pronounced in comparison to the interests of the adoptee at the time of the adoption. Thereafter the interest of the adoptee advances, however, in contradistinction to those of the natural and adopted parents, which recede. The adoptee's interests become of greater import as he or she

---

1. A. Haley, *Roots* (1976).

grows, to the point where, as an adult, they predominate over those interests which once had a superior claim.[2]

This sliding scale would provide the framework for a determinative calculation in the quest of adoptees for their sealed adoption records. No request should be granted automatically; each should compel a careful balancing of what may be extremely sensitive personal interests. There may be cases, for example, wherein the superior interests under the aforementioned sliding scale would nonetheless not prevail for reasons of the strength of a compelling personal objection.

Yet this standard would respect the integrity and maturity of adoptees and not treat them perpetually as children who must be shielded from the truth.

Because this cause is to be remanded for an evidentiary hearing, I concur in the result reached in the majority opinion.

**2.** Our neighboring state of Kansas permits adopted persons of legal age to see the original birth certificate on request or by order of court. K.S.A. 65–2423. This has been the law in Kansas since 1951. I do not believe this statute would have endured this long if its effect were to discourage adoptions.