**In the Matter of the Application of James G. GEORGE, Applicant.**

**No. WD 32822.**

Missouri Court of Appeals, Western District.

Aug. 25, 1981.

As Modified On Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 15, 1981.

Application to Transfer Denied Oct. 2, 1981.

Judith A. Sharp, Sharp & Scully, Kansas City, for applicant.

Michael E. Curley, Kansas City, Guardian ad Litem for natural parents, pro se.

Before MANFORD, P. J., and DIXON and NUGENT, JJ.

DIXON, Judge.

James G. George appeals from an order of the Juvenile Court of Jackson County denying his application for an order to open the records of his adoption pursuant to § 453.120 RSMo 1978. The controlling and dispositive issue is whether or not the trial court properly followed the procedures for release of such information outlined in *Application of Maples*, 563 S.W.2d 760 (Mo. banc 1978), and *Application of Gilbert*, 563 S.W.2d 768 (Mo. banc 1978).

The applicant, James G. George, was born August 18, 1947, and was adopted shortly thereafter. The adoption occurred in the Juvenile Court of Jackson County, Missouri. In September, 1980, he first initiated an inquiry by letter to the court requesting information about his adoption records. The Juvenile Judge responded to that letter of inquiry pointing out that he was unable to release such information absent a proper application and a showing of good cause. Thereafter, George filed a written application seeking the release of the names of his natural parents. The court, acting pursuant to the directive of *Maples, supra,* contacted the natural mother and requested certain information from her and appointed for her a guardian ad litem, likewise suggested by the decision in *Maples*. The natural mother refused to consent to the release of her name to the applicant and further asserted to the juvenile judge that applicant's natural father did not know of her pregnancy resulting in the applicant's birth and if identified he would probably deny paternity.

These facts were communicated to the applicant and his attorney and an open evidentiary hearing was conducted.

The record in this case consists almost entirely of medical testimony. Because of the circumstances, the medical testimony is of necessity largely theoretical. The fundamental issue of necessity, however, rests upon the medical evidence.

The applicant is 33 years old and was born at a maternity center in Kansas City, Missouri. He was adopted shortly after his birth by a couple whose surname he bears. His adoptive father is deceased, and the file contains a verified consent from his adoptive mother to release any information concerning his natural parents.

Sometime in 1980, the applicant came under the care of a Dr. Rosen in Florida

where the applicant now lives. Dr. Rosen diagnosed the applicant's medical problem as chronic myelocytic leukemia which is a term synonymous with chronic granulocytic leukemia. This is a malignant disease of the bone marrow. The disease is diagnosed upon appearance of the factors of anemia and high white cell count in the blood and by physical changes in the bone marrow. The physical changes in the bone marrow are an alteration of the bone marrow from a composition of half fat and half blood producing cells to a state where no fat is present and the bone marrow consists entirely of blood producing cells. Characteristically, the balance of cells producing white cells and red cells for the blood is altered and an excessive number of white cells is produced with an excessive number of immature white cells. There are usually present in a higher than normal number white cells referred to as granulocytes. The chronic granulocytic leukemia is distinguished from acute leukemia by the presence or absence of any mature white cells. In acute leukemia, there are larger accumulations of immature white cells. Both acute leukemia and chronic granulocytic leukemia typically present an overproliferation of blood cells, but in chronic granulocytic leukemia some of the blood cells are mature and can perform a normal function while in acute leukemia few if any mature cells appear.

Chronic granulocytic leukemia is a progressive disease and ultimately will cause the death of the patient. The progression of the disease is not uniform, either timewise or in type. One half of the patients survive less than forty months; one half survive more than forty months. The progression of chronic granulocytic leukemia is most usually to acute leukemia in threefourths of the cases, but it sometimes progresses to other acute forms or types. The evidence speaks of a "transformation" of chronic granulocytic leukemia to some other form of bone marrow disease, usually acute leukemia in which there is an absence of normal bone marrow function in the supply of normal mature white cells, the absence of which causes the death of the patient from bleeding or infection. When the disease has "transformed," death occurs within months or weeks.

Chronic granulocytic leukemia in the stage present in the applicant is treated with drugs, busulfan or hydroxyurea, which tend to make the blood counts normal or near normal and symptoms absent. Such chemotherapy is continued "until it no longer works," which may be "weeks, months, or years."

The applicant has been treated with busulfan and at the time of the hearing was not receiving such treatment. The applicant was being regularly checked for the progression of the disease and his explanation for the suspension of the treatment was that it becomes progressively less effective and that once a remission is achieved, its use is suspended until the white count again reaches an unreasonable level. The medical testimony was that various other types of therapy had been utilized and that once the disease had become "refractory" or "failed on standard therapy" no increase or different treatment by way of chemotherapy would check the ultimate course of the disease.

Most of the medical testimony centered upon the technique of bone marrow transplant which has been developed in the last four or five years. In that procedure, the bone marrow of the patient is eliminated by radiation and the patient is sustained by blood transfusions since the elimination of the bone marrow has eliminated the body's capacity to generate blood. Bone marrow from a donor is then injected into the blood stream of the patient and, if successful, will result in the regeneration of the patient's bone marrow. If the transplant fails, the patient dies. The procedure presents a high risk of failure with somewhat over half of the patients surviving the transplant and its complications when it has been done between full blooded siblings. When the procedure has been utilized between identical twins, the results are dramatically better with an 80 percent survival rate.

The medical testimony was based on twenty cases of identical twins and approximately fifty other cases of persons who were not identical twins. The total number of such transplants in all categories is less than one hundred. Only one case of a transplant in a patient with chronic granulocytic leukemia was within the personal knowledge of the medical witness, and it had been performed six months before the hearing. All other cases known to the witness had been performed after the disease had become "refractory" or transformed. The procedure is characterized as "experimental."

The success of the procedure depends upon the acceptance by the patient's body of the transplanted marrow and that, in turn, apparently depends upon the degree of matching between the donor and the donee in what is referred to as the blood antigens. This is determined by a test for human leukocyte antigens (HL–A testing). There are five types of information utilized in the typing of the blood of the donor and the donee. These bits of information are located on the 6th chromosome, and these loci are referred to as the A, B, C, D, and DR loci. All but D are defined by usual serological testing procedures. D requires a test involving a mixing procedure with the patient's blood. The "D" test is only done if a match occurs in the other four factors.

Complicating the question of compatibility between the donor and donee for purposes of transplant is the presence or absence of unknown antigens which have not yet been identified. Because the blood antigens are genetically derived, the preference among otherwise HL–A matched donors is for a related as opposed to a nonrelated donor. Thus, an identical or single placenta twin is an ideal donor because of the genetic identity of such twins. Between siblings of the whole blood, the chances for an HL–A match are that a match will occur in one out of four cases. Presumably, when such a match occurs between siblings of the whole blood, the genetic identity would also increase the chances of the unknown antigens likewise matching. A match between parent and child is "rare." If a parent should prove to be an HL–A match with the patient, the results of the donation from such an HL–A matched parent seem "quite satisfactory." For donors more distantly related than parents or siblings, the chances for an HL–A match become increasingly remote on a very pronounced basis. As contrasted with the one in four chance for a match between siblings, the chances for more remote relatives matching become one in two or three hundred. The chances are sufficiently remote that in standard procedure only siblings are tested.

For a transplant in the applicant's present condition, the following question from the court and the answer of the expert appears:

Q Would you agree with this statement: That such a bone-marrow transplant requires a genetic match of bone-marrow acquired by the natural sibling to the donee?

A Yes; right now I don't think anybody would want to be doing transplants for chronic granulocytic leukemia, except for matched parents or siblings.

. . . . .

Q Do I understand you to say it does require it at this time, rather than being desirable?

A Yes.

MR. CURLEY: That statement said— does that statement say full blooded sibling or simply sibling?

THE COURT: Natural sibling.

MR. CURLEY: A natural sibling. I'm not sure I know what that means. When you answered the question, what did you take that to mean; full blooded or half blooded, or both?

THE WITNESS: I guess both.

MR. CURLEY: Both, okay.

The same medical witness had earlier stated that the probability of a half sibling matching was less than that of the full sibling's probability of one in four chances. This would be consistent with the testimony concerning the genetic origin of the HL–A match.

The nub of the question as to the availability of matching donors in the applicant's natural family seems to be contained in the following question and answer. In response to a specific inquiry that if a patient were offered an opportunity to test a mother and a half sibling on the agreement that no further tests would be sought from other members of the family on the mother's side, would he advise the patient to accept such a situation, the doctor answered, "yes" and added:

> Those are the two people that are most likely to match, and when I recommended—when we're talking about bone-marrow transplants, and I tell people if we want to pursue it, we have to do typing, I wouldn't recommend to them under other circumstances typing beyond that. That is, we type siblings and parents for people for potential bone-marrow transplantation within a family, unless you would have the unusual circumstance of having somebody who's a double cousin.

Q Sure.

A Those people would be typed. But since I wouldn't recommend typing cousins and aunts and uncles otherwise, I don't see any reason why I would recommend it is in this situation.

The foregoing testimony was all cast in the mold of the medical situation of the applicant at the present time, a condition of chronic granulocytic leukemia.

Even if such a qualified donor were available at the present time, the procedure is so life threatening that it would not be recommended. It would be explained to the patient with a full statement of the attendant risks. As the witness put it, only with "fully informed consent" from the patient would the procedure be attempted in a patient with chronic granulocytic leukemia. What appears to be a much more common approach to transplants of this nature is for the patient to undergo more conservative therapy until the disease approaches the "refractory" or "transformation" stage and then pursue the transplant therapy when the disease itself threatens imminent death.

All but one of the transplants known to the medical witness had occurred after or at the time the disease had become "refractory" or transformed. Because of the exigency of that situation, the transplant is then attempted in some cases with a matched but unrelated donor or even in some cases with a partially matched and unrelated donor. The survival rate for such attempts is markedly lower than the average of slightly over fifty percent. The witness said one in ten for unrelated partially matched donors.

The matching process can be done with a blood sample of 20–30 cc and does not require identification of the donor. The donation process, although requiring general anesthesia, is not ordinarily life threatening or even seriously discomforting to the donor. The only substantial risks are those incident to a general anesthesia which is required when the donor's bone marrow is removed. The donation may likewise be conducted anonymously. A donor who otherwise matches the patient's HL–A may also be determined to be an inappropriate donor for reasons of health.

The applicant had not been HL–A typed but offered during the hearing to be so typed. Such evidence would have been highly relevant in determining the probabilities of discovering a match since there was testimony that some HL–A types are more common than others.

There was also evidence that pools of donors have been established in England and several locations in the United States. The applicant has made no inquiry of these centers.

Summing up this medical evidence, a disclosure of the adoption records would have revealed the name of the natural mother who would "rarely" be a potential donor and thus the name of the half sibling who might be a somewhat more likely donor than the natural mother. The mother has refused to divulge the name of the father, but conceivably some likelihood of the disclosure of his name may occur from the adoption records and thus another "rarely qualified" donor might be disclosed. There may, of course, be other half siblings whose

identities might be disclosed. The medical evidence is that any more distant relatives would be no more likely to match than the general population so disclosure or discovery of such relatives does not appreciably aid the applicant. It is far from clear that the statement of the doctor witness that he would prefer related donors over unrelated donors applies to more distant relatives than the father, mother, or siblings. In fact, the evidence, fragmentary as it is, concerning the genetic origin of the blood antigens inferentially suggests that the unknown antigen match would only occur in the siblings, by the operation of the laws of genetics.

One other procedural fact must be noted. During the course of the hearing before the juvenile judge, the guardian ad litem attempted to make an offer with respect to the testing of the natural mother and her daughter (who is apparently her only living child other than the applicant). The offer was to submit both the mother and the daughter to a testing process to determine if they were suitable donors. The offer was conditioned, however, upon the acceptance by the applicant of the results of that testing without further inquiry as to the identity or suitability as donors of any other blood relatives of the mother. Although the trial judge refused to accept the offer, couching his refusal in terms of an evidentiary ruling, the offer appears in the transcript.

Upon the conclusion of all the evidence and the arguments of counsel, the court denied the application. Judge Martin, in announcing his decision to deny access to the record, made a statement of the reasons for his decision which demonstrates the care and concern with which he dealt with the problem presented to him. In the course of his statement, he recited the ultimate facts with respect to the medical testimony. That recitation of ultimate facts is entirely consistent with the medical evidence and with the recitation of such facts above.

In light of those facts, Judge Martin concluded that the determination whether to release the names of the natural parents of the applicant depended upon a determination of good cause requiring such disclosure. He further concluded that in determining that issue the court should exercise its discretion in balancing the conflicting interests. The interests were: (1) the nature of the circumstances dictating the need for release of the identity of the birth parents; (2) the circumstances and desires of the adoptive parents; and (3) "the circumstances of the birth parents and their desire or at least the desire of the birth mother not to be identified;" and (4) the interests of the state in maintaining a viable system of adoption by the assurance of confidentiality.

Implicit in the determination by Judge Martin was his opinion that he was not required to contact the natural father, independent of his contact with the natural mother. The court explicitly stated that any information that might be contained in the records was of necessity obtained from the natural mother and the use of that information was subject to her consent. It does not appear from the evidence whether there is any independent or recorded evidence indicating the identity of the father. It is clear, however, from Judge Martin's expressions in the course of the hearing that he did not believe he had any right to pursue the identification of the natural father in the face of a lack of consent by the mother.

In his brief, the applicant posits error on the part of the trial court for failing to follow the mandate of *Maples, supra,* and contact the natural father of the applicant.

A consideration of this point requires a close analysis of *Maples, supra. Maples,* and a companion case, *Gilbert, supra,* are the only cases construing the statute here involved, § 453.120 RSMo 1978, which reads:

453.120. *Records of adoption proceeding not open to inspection except on order of the court—penalty for violation.*—1. The files and records of the court in adoption proceedings shall not be open to inspection, or copy, by any person or persons, except upon an order of the court expressly permitting the same and pursuant to written application.

2. Any person who permits such inspection, or copy, without an order of the court as herein provided, shall be guilty of a misdemeanor.

*Maples* arose upon an application by an adopted child to require the circuit court to open the records of her adoption, which was refused by the circuit court. The Supreme Court reversed the trial court and remanded for the exercise of discretion by the trial court in granting or denying the request.

*Maples* first addressed the constitutional issues raised by the applicant in that case. The court in *Maples* found § 453.120 RSMo 1978 immune to constitutional attack upon First, Fourteenth, and equal protection grounds under the federal Constitution. Much abbreviated, but as bearing on the issues in the case, the rationale of *Maples* on the constitutional issues follows.

As to the claim under the First Amendment, the court pointed out that the information sought was a product of the judicial process under the adoption laws. The court said:

> [T]he state's protection of the adoption process by control of its judicial records does not rise to the level of an unconstitutional infringement of appellant's First Amendment right to receive information but rather is the exercise of a valid state interest, balancing conflicting rights of privacy and protecting the integrity of the adoption process which could suffer if the confidentiality of the records were diminished.

563 S.W.2d at 762.

The "liberty and privacy" issues in *Maples* were premised upon the applicant's claim that the statute interfered with "family relationships." In distinguishing the applicant's citation of *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed.2d 1042 (1923) and *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the court emphasized that the statute created rights of privacy in the natural parents and members of their families, which were necessary to protect and foster an effective system of adoption.

The applicant's equal protection argument in *Maples* was, in part, directed to a claim of discrimination arising from the right of nonadopted children to acquire family information as opposed to the statutory limitation upon that right in adoptees. The Supreme Court held there was no denial of equal protection since all adoptees were treated alike in the protections afforded under the adoption law. The legislature has denied access to the records for all adoptive parents, the natural parents, and the adoptee, as well as curious interlopers. This limitation was necessary to protect the adoption process which guarantees to the adoptee the status of a natural child vis-a-vis, the adopting parents. *Alma Society, Inc. v. Mellon*, 601 F.2d 1225, 1234–36 (2nd Cir. 1979), develops the rationale for rejection of an equal protection argument on the basis of a compelling state interest which is implicit in the *Maples* rationale.

The common thread in the *Maples* decision on the constitutional issues is the protection of the adoption process by the creation of a privacy interest in all concerned parties. This legislative purpose creates and protects privacy based upon a compelling state interest in the viability of the adoption process. The creation of a right of privacy in the records is thus incidental and subservient to the overall purpose of maintaining a viable system and thus justifies the legislatively created exception to the privacy of the records when a court shall order their release. If it were necessary to meet the constitutional grounds advanced by the applicant, *Maples* would control.

The procedure outlined in *Maples* serves that underlying purpose. The court in *Maples* recognized the nature of the right of privacy as being one founded upon legislative policy and not upon private right. It is true that the court recognized the practicality of a waiver by the natural parents. Nothing in the statute prevents a party to an adoption proceeding from voluntary disclosure of facts known to them.

The statute protects the *record*. Thus, the court in *Maples* says that absent voluntary disclosure of identity and whereabouts,

"It is difficult to perceive a case in which circumstances would warrant disclosure . . . unless such waiver is had." *Id.* at 766.

The holding of *Maples* is on the procedural ground that the trial court had failed to exercise discretion in determining the issue.

Upon remand, the opinion directs the trial court to exercise that discretion within specific guidelines in the following language:

> The disclosure of some information does not require the record be thrown open, instead, only so much information as the court adjudges necessary for the good cause shown need be disclosed. Information as to the *identity* and *whereabouts of the natural parents*, the adoptive parents or the adopted child may be released only under compelling circumstances and further *the court is encouraged to obtain the consent of such persons*, if possible. The court through its juvenile officer or other functionary under its control may, when the factual situation justifies, institute a confidential inquiry *of those concerning whom the information is sought* and if waiver of the confidentiality of the records as to their "identity or whereabouts" is not obtained, such fact should be shown great deference by the court. It is difficult to perceive a case in which circumstances would warrant disclosure of that information unless such waiver is had. The persons whose waiver is sought should, if possible, be fully advised by the court of the pending action and afforded the opportunity to be represented in that proceeding, yet maintain their anonymity. The court in an appropriate case should appoint a guardian ad litem.

*Id.* (emphasis added, in part).

 There is nothing in that direction from the Supreme Court that justifies the decision of the trial court in this case to exclude contact with the natural father if information is available to permit that contact. Obviously, it may in some cases be impossible, but the effort should not be thwarted upon the basis of the mother's claim. Such inquiry should, of course, be discreet and in no event should the court provide information as to identity and whereabouts of natural parents without the consent of *both* natural parents, if there is no overriding compelling circumstance requiring disclosure absent such consent.

It is apparent that a risk exists that the natural father may breach the privacy of the mother by his own act when contact is made. If the risk exists, it has always existed. If, as the mother claims, the father did not know of the pregnancy, it is unlikely that the father will immediately make a full disclosure.

If under the view entertained by the trial court, the mother had consented and the court had opened the records, the privacy of the natural father might have been invaded without his consent directly contrary to *Maples*.

More importantly and decisive in the circumstances of this case, the failure of the trial court to contact the natural father, if that be possible, effectively prevented any partial disclosure of information which might eliminate any real necessity for opening the records in this case.

There appears to be a willingness on the part of the natural mother to determine the critical medical facts concerning her suitability for donation as well as that of her child. The natural father might likewise agree. Such information reliably obtained by the court as to the natural parents and their children, if any, would under the record presented make any further disclosure unnecessary. The applicant's own witness would not undertake further testing for an HL–A match than the natural mother proposed to the court. Thus, it must be concluded that the trial court erred in not concluding either personally, or by some other person chosen in his discretion under the mandate of *Maples*, a confidential inquiry of the natural father if the record discloses information which permits such inquiry. If the record does not permit locating and contacting the putative natural father, the court should so indicate.

An issue which is not dispositive of this appeal by its nature must be considered.

At trial and upon appeal, the applicant has insisted that *Maples* requires an intermediary be involved in any contact with the natural parents. The applicant suggests that someone skilled in reuniting adoptees and their natural parents is the appropriate mediator. He also boldly asserts the intermediary should be an advocate for his position and that the advocate should attempt to persuade the parents to the applicant's position. The applicant presented evidence from a representative of a group interested in such activities. This evidence focused upon the methods and success of such groups in tracing and "reuniting" adoptees and their natural parents.

From the inception of this proceeding, the applicant and his counsel have asserted that the court should disclose the contents of the adoption records to this group and have all contacts with the natural parents made through them. At trial and here on appeal applicant has asserted it was error for the trial court not to have accepted such an intermediary.

■ Applicant maintains not only that the court erred in not accepting this suggestion, but impugns the actions of the court in this case. Applicant asserts that the action of the trial court in contacting the natural mother directly, and thus receiving communications from her, improperly influenced the court and may have improperly influenced the natural mother to withhold her consent. Coupled with this is the extraordinary charge that the actions of the trial judge gave "the appearance of impropriety."

Applicant supports the argument by a quotation from *Maples* as follows:

> [T]he court is encouraged to obtain the consent of such persons if possible. The court *through its juvenile officer or other functionary under its control* may, when the factual situation justifies, *institute a confidential inquiry* of those concerning whom the information is sought and if waiver of the confidentiality of the records as to their "identity or whereabouts"

is not obtained, such fact should be shown great deference by the court.

563 S.W.2d at 766 (emphasis supplied).

*Maples*, in the quotation set forth, cannot be read as a direction to the court to abstain from the action the trial court voluntarily undertook in the instant case. To hold otherwise would be to say that the information from such a confidential inquiry when filtered through an intermediary is more reliable than the court's personal contact. The nature of the direction in *Maples* removes the entire proceeding from the realm of adversary proceedings and invests the trial judge with discretionary power to act himself or to delegate to others the task of making such a confidential inquiry.

It is true that as a result of its inquiry and its investigation the court determined certain facts bearing on the issue. The court stated that the natural mother had no full blooded siblings of the applicant and only one living half sibling. Applicant asserts that he has been denied the opportunity to test the accuracy of this factual determination by cross examination and his own investigation. He does not suggest how this may be done without compromising the confidentiality of the inquiry.

In this case, a sincere and dedicated trial judge has voluntarily undertaken to assist this applicant through his personal intervention. That effort and the consequent fact finding of the court is accepted by this court without any reservation or doubt. Any claim of impropriety is flatly and unequivocally rejected. Viewed in its entire context, the argument is nothing more than a veiled attempt to attack the confidentiality the legislature has decreed for such records by involving groups whose avowed aim is to destroy the confidentiality of adoption records. The possibility, perhaps even the probability, that disclosure of information to such a group might result in subtle or perhaps overt coercion of natural parents in what such an intermediary may consider the "proper decision" is a sufficient ground to deny them access. This court is content to rely upon the integrity and fairness of

the circuit judges and those whom the judges in their discretion designate for such confidential inquiry. The statute reposes the duty in the *court* to order or deny disclosure. *Maples, supra*, directs a confidential inquiry and the court in the person of the trial judge is a perfectly appropriate and competent agency to make such an inquiry if the trial court in its discretion prefers not to use intermediaries.

*Maples* is controlling authority under Art. V, § 2 Missouri Constitution. This court concludes the decision of the trial court must be reversed and remanded because of a failure to exhaust the remedies directed by *Maples* prior to exercise of discretion by the trial judge in a determination of the issue of disclosure.

■ The trial court is specifically directed to contact the natural father, if information is available to identify the natural father. This is to be accomplished even if the source of the information concerning the natural father originated from contacts with the natural mother. This inquiry is to be conducted either by Judge Martin or "functionaries within his control" which is construed as either an employee of the court subject to the court's direct control or an attorney acting as a guardian ad litem for the natural father and as an officer of the court. The contention of the applicant to utilize other "third persons" has been specifically rejected.

Such inquiry shall be made confidentially and any medical information obtained shall be disclosed only with the consent of the natural father and anonymously. As previously noted, the consent of both parents is required to release information as to identity and whereabouts absent a discretionary ruling that compelling circumstances justify overriding the desires of the natural parents for anonymity. The court cannot compel consent, nor can the court compel the disclosure of medical information from the natural parents or children if there be any such children of the natural father. The court may, of course, act as an intermediary in furnishing any information or offers of assistance to the applicant and in doing so

preserve the anonymity of the natural parents. The furnishing of such information or assistance upon an anonymous basis is consistent with the concept of *Maples* that, where possible, a limited disclosure should be undertaken to avoid releasing the names of the natural parents.

Upon completion of this investigation and consideration of whatever voluntary disclosures or offers of assistance which may result, the court should determine if, under all the facts and circumstances, a compelling necessity exists for a disclosure and, if so, whether that necessity is properly served by disclosure of the names of the natural parents. Since this is a remand, the court may take additional evidence, including any evidence that might be offered by the guardian ad litem for the natural father. Nor is the court precluded in the peculiar procedural context of this case from obtaining medical or other expert evidence from witnesses selected by the court. The issue of a review of the trial court's discretion is not reached or decided in this case. Like *Maples*, this opinion reverses and remands to permit the trial court to fully exhaust alternatives to disclosure and upon the basis of the record then may reexercise his discretion.

The trial court was correct in refusing the "offer" of the natural mother which was in terms limited. Any renewal of the natural mother's offer or a similar one by the natural father, not conditioned upon a restraint upon the discretion of the court, should be accepted and acted upon by the court.

The court in acting under the mandate of *Maples* is invested with broad equitable powers. In the exercise of such equitable powers, the court may fashion such relief to the applicant as permits the applicant to receive information or assistance short of full disclosure if that provides a practical solution to the applicant's dilemma.

The exercise of the equitable power to disclose the names of the natural parents should be undertaken only upon the completion of every practical alternative and then upon a balancing of the equities as they exist at that time.

The wisdom of *Maples* in directing less than a full disclosure if the circumstances so dictate should be fully considered by all of the parties in this case. That consideration should include the common sense solutions that are suggested by the factual situation. The instant case does not lend itself to a confrontational solution. If the disclosure of the record is ordered by the court, the natural father and mother and any other close relatives may be so offended by the disclosure that any hope applicant may have for medical assistance will be in vain. It would also be ironic if upon disclosure and testing no suitable matches were found.

The court cannot and should not coerce anyone involved in this case. Contrary to the assertion of the applicant there exists no reason why the court or its functionaries and officers cannot act as an intermediary to obtain medical information and assistance for the applicant while preserving the shield of the statute. Any such efforts by the court are within the letter and the spirit of the decision in *Maples*.

Reversed and remanded with directions.

All concur.

## APPENDIX

1. Statutes providing for the confidentiality of adoption records have been passed in a majority of states. Apparently, 42 states made statutory provision for sealing adoption records and only three (Alabama, Florida, and Kansas) grant automatic access to adoptees who wish to view their original birth records as opposed to adoption records. See generally, *In re Roger B.*, 84 Ill.2d 323, 49 Ill.Dec. 731, 418 N.E.2d 751 (Ill.1981); *Alma Society, Inc. v. Mellon*, 601 F.2d 1225, 1235 (2nd Cir. 1979). In order for an adoptee to gain such access, most jurisdictions require that he or she make a showing of "good cause" why such records should be disclosed. The "good cause" prerequisite to disclosure arises from either statutory mandate or decisional authority, depending upon the jurisdiction. See .e. g., Cal.Civ.Code, § 227 (West Supp. 1979); Mich.Comp. Laws, § 710.67 (Mich.

Stat.Ann.) § 27–3178 (555.67) (Callaghan Supp. 1980); Mass.Ann. Laws Ch. 210, § 5C (Michie-Law Co-op Supp. 1978). The Uniform Adoption Act Section 16(2) is similar to the New York statute construed in *Linda F. M. v. Dept. of Health of City of N. Y. Ct. App.*, 52 N.Y.2d 236, 437 N.Y.S.2d 283 (1981). Both the Uniform Act and New York utilize the "good cause" language of the Missouri statute.

2. Courts and commentators have emphasized the role of sealed adoption record statutes in preserving the integrity of the adoption process. See *Bradey v. Children's Bureau of South Carolina*, 274 S.E.2d 418, 421 (S.C.1981); *In re Roger B.*, 84 Ill.2d 323, 331, 49 Ill.Dec. 731, 735, 418 N.E.2d 751, 755 (Ill.1981); *In the Matter of Linda F. M. v. Dept. of Health of City of New York*, 52 N.Y.2d 236, 437 N.Y.S.2d 283 (N.Y.1981); Comment, *The Current Status of the Right of Adult Adoptees to Know the Identity of Their Natural Parents*, 58 Wash.U.L.Quar. 677, 682–83 (1980); Klibanoff, *Genealogical Information in Adoption: The Adoptee's Quest and the Law*, II Family Law Quarterly 185, 196–97 (1977).

3. Judicial construction of "good cause" sufficient to open adoption records has uniformly required a balancing test between the need to protect the privacy interest of the natural parents and the necessity demonstrated by the applicant. *Bradey, supra*, at 421, and *In re Roger B., supra*, 84 Ill.2d at 329, 49 Ill.Dec. at 734, 418 N.E.2d at 754. *In re Adoption of Rand*, 347 So.2d 450 (Fla. App.1977), affirmed the exercise of discretion by a trial court in refusing to release medical information from the adoption records absent a showing of good cause. Thus, it appears only "birth records" are open in Florida by statute.

4. Constitutional assaults on adoption record statutes find their genesis in a number of law review articles and comments. See generally, Gloor, *Breaking the Seal: Constitutional and Statutory Approaches to Adult Adoptees Right to Identity*, 75 N.W. U.L.Rev. 316 (1980) [expressly critical of the constitutional analysis in *Application of Maples*, 563 S.W.2d 760 (Mo. banc 1978)];

Burke, *The Adult Adoptee's Constitutional Right to Know His Origins*, 48 S.Cal.L.Rev. 1196 (1975); Sheppers, *Discovery Rights of the Adoptee—Privacy of the Natural Parent: A Constitutional Dilemma*, 4 San Fernando Valley L.Rev. 65 (1974); Prager and Rothstein, *The Adoptee's Right to Know His Natural Heritage*, 19 N.Y.Law Forum 137 (1973). In spite of this academic commentary, no reported decision has invalidated a sealed adoption record statute on constitutional grounds. In addition to *Maples*, cases expressly rejecting such arguments include: *Alma Society, Inc. v. Mellon*, 601 F.2d 1225 (2nd Cir. 1979); *Mills v. Atlantic City Dept. of Vital Statistics*, 372 A.2d 646–50; *In re Roger B.*, supra, 84 Ill.2d at 326–37, 49 Ill.Dec. at 733–37, 418 N.E.2d at 753–57; *Bradey v. Children's Bureau of South Carolina*, 274 S.E.2d, supra at 421. For a law review comment focusing specifically on *Maples*, see Smith, *In re the Application of Annetta Louise Maples: The Adoptees Right to Know*, 23 St.L.U.L.J. 731 (1979).